ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 4 2004

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:00-CV-422-Y |
| | § | (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE CONVICTION AND SENTENCE

Petitioner Orlando Cordia Hall (Hall) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Hall replied. The Court denies Hall's motion.

I

*History of the Case*

On October 31, 1995, because of Hall's involvement in the kidnapping and death of Lisa Rene, a sixteen-year-old high-school student, a jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and carrying a firearm during a crime of violence. After a subsequent punishment hearing, the jury, after finding certain aggravating and mitigating factors to be present, recommended, by a unanimous vote, that Hall receive the death penalty. This Court formally imposed

1

Certified a true copy of an instrument
on file in my office on 8/24/04
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

the death penalty on February 12, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Hall's conviction and sentence. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999).

Hall filed an initial motion to vacate in May 2000. In June, this Court granted Hall's request to file a discovery motion, and Hall filed a motion for discovery in August and a supplemental motion for discovery in May 2001. In April 2002, this Court denied his motions for discovery. Hall then filed an amended motion to vacate in June and a second amended motion to vacate in September 2002. The government filed its response in January 2003, and Hall filed a reply in March. This Court conducted an evidentiary hearing on June 7, 2004, regarding Hall's third through fifth claims for relief.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

> Orlando Cordia Hall, along with Bruce Webster and Marvin Holloway, ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.
>
> On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, Arkansas, and Hall took a flight to Dallas, Texas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared. Later, when Hall got in touch with Vitalis and N. Rene by

2

telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed was stolen from them along with Hall's $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister. Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked. The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911. After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas. Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car. Hall got into the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat. The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him. The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. Once Beckley, D. Hall, and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave. That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark. They then returned to the motel room. In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. Lisa Rene's eyes were covered by a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head. He then hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall. Webster and Hall then began taking turns hitting her with the shovel. Webster then gagged Lisa Rene and dragged her into the grave. He covered her with gasoline and shoveled dirt back into the grave. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping. D. Hall, Beckley, and Webster were subsequently arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney. On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas. On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

*Hall*, 152 F.3d at 389-90.

4

## II.

### *Standard of Review*

Title 28, U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence based on its being imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc), *citing United States v. Frady*, 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id*. A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier*, 477 U.S. 478, 493 (1986). Other types of error may be raised for the first time under § 2255 only if the defendant establishes that the error could not have been raised on direct appeal *and*, if the error were condoned, it would result in a complete miscarriage of justice. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

Moreover, claims that were also raised, and rejected, on direct appeal are also barred from federal habeas review. *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). A federal habeas petitioner

5

cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether or not the claims were previously raised on direct appeal. *United States v. Massaro*, 538 U.S. 500, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003).

## III

### *Issues Presented*

In his second amended motion to vacate his conviction and sentence, Hall raises the following nine issues in twelve claims for relief:

A.  Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

B.  Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

C.  A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

D.  The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

6

E.  Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F.  The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall(claim eight).

G.  Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand(claim nine).

H.  The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I.  Hall's rights under the Fifth And Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

Hall also requests an evidentiary hearing before this Court on all of his claims.

## IV

### *Procedural Bars*

In its response to Hall's petition, the government asserts procedural bars to this Court's consideration of many of the claims that Hall raises in his petition.  The government asserts that Hall is procedurally barred from raising all but his second and part of his third through fifth claims for relief because the claims were

not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

In his reply, Hall asserts that these claims are not procedurally barred from this Court's review because the claims are based on new factual or legal bases.  Hall further asserts that he can establish cause and prejudice to overcome any procedural bar because his counsel were ineffective on direct appeal.  With respect to Hall's third through fifth, and ninth through eleventh claims for relief, this Court agrees that these claims are based on new facts not previously available to Hall, including affidavits obtained from various individuals during the habeas process. Specifically, Hall's eleventh claim, a selective-prosecution claim, is based on statistics that were not available at the time of his trial or appeal.  Moreover, Hall's first claim for relief is based on cases decided by the Supreme Court after Hall's direct appeal was final.  Accordingly, none of these claims are procedurally barred from habeas review.  Furthermore, as noted earlier, Hall's second claim for relief, alleging numerous ineffective-assistance-of-counsel claims, is cognizable on habeas relief.  Finally, in the interests of justice, this Court will address Hall's sixth, seventh, eighth, and twelfth claims, although they were not raised on direct appeal and are not based on new law or facts, as Hall has alleged that his appellate counsel was ineffective for not raising these claims.

8

**V**

***Discussion of Claims***

## A.    <u>Ring v. Arizona Claim</u>

In his first claim for relief, Hall contends that his conviction and death sentence violate the Fifth Amendment.  Specifically, Hall asserts that, under the Supreme Court's recent cases *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made Hall eligible for the death penalty under the Federal Death Penalty Act (FDPA).  The government responds that Supreme Court precedents do not require that these things be alleged in the indictment and that, in any event, this claim is unavailable to Hall at the habeas level because it is barred by *Teague v. Lane*, 489 U.S. 288, 310 (1989).

*Applicable Statutory Law*

Under 18 U.S.C. § 1201(a)(1), a person who unlawfully kidnaps a person and transports her to another state *shall* be punished by either life imprisonment or death where the death of any person results from the kidnapping.  In order for a person found guilty of such a kidnapping to be sentenced to death, the government must prove beyond a reasonable doubt at a sentencing hearing that the defendant either intentionally killed the victim, intentionally inflicted serious bodily injury that resulted in the death of the victim,

9

intentionally participated in an act that resulted in the victim's death where the defendant contemplated that a life would be taken, or intentionally engaged in an act of violence with reckless disregard for human life where the act caused the death of the victim. 18 U.S.C. § 3591(a)(2).

Furthermore, under 18 U.S.C. § 3593(a)(1), the government must provide timely notice of its intent to seek the death penalty in a case where the death penalty is a possible sentence. This notice must set forth the aggravating factor or factors that the government intends to prove at the sentencing hearing. *See* 18 U.S.C. § 3593(a)(2), (b). Several aggravating factors are set forth in 18 U.S.C. § 3592(c), but the jury may consider other non-statutory aggravating factors if notice has been given.[1] At the conclusion of the sentencing hearing, the jury must make special findings setting forth which aggravating and mitigating circumstances, if any, it finds. Any findings with respect to an aggravating circumstance must be unanimous. 18 U.S.C. § 3593(d). If the jury unanimously finds the existence of at least one aggravating factor under § 3592(c), the jury must weigh all aggravating factors with any mitigating factors and must by unanimous vote determine that the aggravating factors outweigh any mitigating factors in order for a defendant to be sentenced to death. 18 U.S.C. § 3593(e).

---

[1]    The statute also sets forth a number of mitigating circumstances to be considered by the jury in determining whether a sentence of death should be imposed. 18 U.S.C. § 3592(a).

*Applicable Case Law*

In *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999), a federal case involving a defendant who was convicted of carjacking, the Supreme Court held that, under the Fifth And Sixth Amendments, any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. In *Apprendi v. New Jersey*, a case involving a defendant sentenced for shootings under a hate-crimes statute, the Supreme Court extended this rule to state convictions under the Due Process clause of the Fourteenth Amendment. *Apprendi*, 530 U.S. at 491.  The Supreme Court noted in *Apprendi*, however, that Apprendi had not raised a constitutional claim that the Fifth Amendment required that any factor that might enhance his sentence had to be presented in an indictment. Rather, Apprendi had raised only a claim that he had a right to trial by jury under the Due Process clause of the Fourteenth Amendment. *Id.* at 477, n. 3. The Supreme Court has subsequently reiterated that, under *Jones* and *Apprendi*, any fact, other than a prior conviction, that increases the penalty of a federal crime beyond its statutory maximum must be charged in the indictment. *United States v. Cotton*, 535 U.S. 625, 627 (2002).

Subsequently, in *Ring v. Arizona*, the Supreme Court in effect extended the rule announced in *Apprendi*, holding that under the Sixth and Fourteenth Amendments capital murder defendants are entitled to

11

a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring*, 536 U.S. at 589. Again, however, Ring had not argued before the Supreme Court that his indictment was constitutionally defective under the Fifth Amendment because it did not charge the aggravating circumstances which made him eligible for the death penalty, and the case was not decided on that basis. *Id.* at 597, n. 4; *see also United States v. Bernard*, 299 F.3d 467, 489 (5th Cir. 2002) ("*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors.")

Recently, in *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), a direct appeal by another criminal defendant who received the death penalty in this court, the Fifth Circuit held that, following *Ring v. Arizona*, the Fifth Amendment requires the federal government to charge, by indictment, the statutory aggravating factors it intends to prove in order to render a defendant eligible for the death penalty. *Id.*, slip op. at 4. The Fifth Circuit further held, however, that such *Apprendi* error is susceptible to a harmless error review because it is not a structural error. *Id.*, slip op. at 5-6. The Court then held that the error was harmless beyond a reasonable doubt under the harmless-error test set forth in *Chapman v. California*, 386 U.S. 18 (1967), because the government provided notice of the statutory aggravating factors it intended to prove at trial

12

four months prior to trial and because any rational grand jury would have found probable cause to charge Robinson with at least one of the aggravating factors that were omitted from his indictment. *Robinson*, slip op. at 8-9.

### *Analysis*

At the punishment phase of Hall's trial, the jury found beyond a reasonable doubt that Hall intentionally engaged in conduct intending that Lisa Rene be killed or that lethal force be employed against her and her death was a result of this conduct, a mental state that made him eligible for the death penalty. (R. Nov. 6, 1995:5). Furthermore, the jury unanimously found the existence of two statutory aggravating factors and two non-statutory factors. Some jurors found the existence of four mitigating factors and, after weighing the aggravating and mitigating factors, the jury unanimously recommended the death penalty. (R. Nov. 6, 1995:5-7.)

Hall does not contend that his Sixth or Fourteenth Amendment rights were violated by the sentencing structure of the Federal Death Penalty Act. As required by *Apprendi* and *Ring*, the jury made the determination beyond a reasonable doubt that Hall had the requisite mental state that made him eligible for the death penalty, and the jury made the determinations regarding the aggravating factors, the existence of at least one being required in order for the death penalty to be imposed. Instead, Hall maintains that the indictment against him was "fatally flawed" under the Fifth Amendment because

13

it did not allege the mental state the government intended to prove under 18 U.S.C. § 3591(a)(2) and because the indictment did not allege what aggravating factors that the government intended to prove at sentencing pursuant to 18 U.S.C. § 3592(c). (Second Amended Petition at 25.)

As noted earlier, the Fifth Circuit has recently expanded the rulings in *Apprendi* and *Ring* to require not only that the jury make the findings regarding sentencing but also to require that the grand jury indictment set forth the mental state and aggravating factors intended to be proven by the government at sentencing. *See Robinson*, slip op. at 4. *Robinson*, however, was a direct-appeal case. The Fifth Circuit has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane*, 489 U.S. 288 (1989). *See United States v. Brown*, 305 F.3d 304, 309-10(2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* And the Supreme Court recently ruled that the rule in *Ring* is a new procedural rule that does not be apply retroactively to cases on habeas review. *Schirro v. Summerlin*, __ U.S. __, 124 S.Ct. 2519, 2526 (2004). If a federal habeas petitioner cannot apply retroactively the rulings in *Apprendi* nor *Ring* to a conviction that was final before these cases were handed down, under *Teague* the Fifth Circuit's ruling in *Robinson* is not applicable to Hall, whose conviction was final well before these cases were handed down by the

14

Supreme Court and the Fifth Circuit. Accordingly, this claim is *Teague*-barred.

With regard to Hall's substantive claim, the Fifth Circuit has held that *Apprendi* error, even on direct appeal, is subject to a harmless-error analysis. *See United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002); *United States v. Baptiste*, 309 F.3d 274, 278-79(5th Cir. 2002). In *Matthews*, the Fifth Circuit applied the *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard that is applicable on direct appeal and held *Apprendi* error to be harmless where, looking at the evidence presented at trial, it is clear that any rational jury would have charged the defendant with all of the elements of the crime. *Matthews*, 312 F.3d at 665-66. And, most recently, the Fifth Circuit applied the *Chapman v. California* harmless-error standard in *United States v. Robinson*.

Applying the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1992), which the Supreme Court established for use in federal habeas cases involving an allegation of constitutional error at trial, it was harmless not to include in the indictment against Hall the intent element or the statutory aggravating factors. Under this standard, in order to be entitled to habeas relief, a petitioner must prove that an error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-8. Hall has not shown a substantial and injurious effect or influence. He has not shown that, given the evidence presented to

15

the petit jury, the grand jury would have declined to include in the indictment the specific intent element or at least one statutory aggravating factor. After all, the jury that decided Hall's sentence unanimously found the existence of requisite intent beyond a reasonable doubt and unanimously found the existence of several aggravating factors. Moreover, Hall has not shown that he was harmed by a lack of notice on these issues.  The government provided the required statutory notice to defense counsel, setting forth both the specific intent and the aggravating factors it intended to prove at trial.  Hall is therefore not entitled to relief on this claim, and his first claim for relief is denied.

**B.    <u>Ineffective-assistance Claims</u>**

In claim two, Hall asserts that his trial counsel were ineffective in numerous respects.  Specifically, Hall contends that they were ineffective for: 1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses; 2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony; 3) failing to call available and known witnesses to testify at punishment; 4) failing to question government witnesses in order to present additional mitigating evidence; 5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase; 6) failing to re-interview

16

a potential defense witness after he appeared to have altered his testimony; 7) failing to make a closing argument at the guilt phase of the trial; 8) failing to argue effectively that Hall should have been allowed to make a statement in allocution; 9) making uninformed and unreasonable decisions regarding their choice and use of witnesses; 10) failing to adequately argue their motions for continuance; 11) making an ineffective closing argument at the punishment phase; and 12) failing to conduct an adequate *voir dire*.

### Standard of Review

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or

17

proceeding fundamentally unfair due to deficient performance of counsel).

Recently, in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court applied the *Strickland* standard to a claim that counsel was ineffective by failing to investigate potentially mitigating evidence. In *Wiggins*, the Court stated that the appropriate inquiry is whether the investigation supporting counsel's decision not to present certain mitigating evidence was itself reasonable. *Wiggins*, 123 S.Ct. at 2536. This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*

*Analysis of Ineffectiveness Claims*

1.    Failure to Investigate

Hall first contends that his trial counsel were ineffective for failing to conduct a timely investigation regarding potential mitigating evidence. Specifically, Hall faults counsel for not conducting adequate investigation on their own between the time they were appointed on March 21, 1995, and the beginning of Hall's trial, and for failing to seek the assistance of a mitigation expert until September 7, 1995, and not meeting with the appointed mitigation expert until September 15, 1995, when the voir-dire portion of Hall's trial began on October 1, 1995. Hall maintains that: because his trial counsel failed to timely investigate potential mitigating

18

evidence, they unreasonably made the decision to rely on the "equally-culpable-co-defendants" statutory mitigating factor, rather that investigating mitigating evidence about Hall's deprived background; the defense witnesses who did testify about Hall's background at the punishment phase of the trial were ill-prepared; and trial counsel failed to present testimony from numerous other witnesses.

With regard to a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003), *citing Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*, ___ U.S. ___, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

*Facts Applicable to First Ineffectiveness Claim:*
*Failure to Investigate*

As support for his assertions, Hall points to vouchers submitted by defense counsel, Michael Ware and Jeffrey Kearney; and the defense investigator, Danny LaRue; as well as affidavits from the mitigation specialist, Tena Francis; a defense attorney who assisted trial

19

counsel in this case, Kevin McNally; a well-known defense attorney, Michael Tigar; and a social worker, Jill Miller; this Court's orders appointing a mitigation specialist and authorizing a total of $7500.00 for that specialist's services; declarations from Betty Hall and Cassandra Ross, both defense witnesses at trial; and declarations from numerous persons outlining their potential testimony, had they been called as witnesses by the defense. (Hall's Exhibits #3, 5, 6-9, 12-19, 23, 25-30, 34-38; Hall's Reply Exhibits 2-5, 7-8, 10-11.) In response, the government has submitted affidavits from both Ware and Kearney.  (Government Exhibits E & F.)

A review of these documents submitted by the parties, as well as the record of the trial reveals that, prior to Ware and Kearney's being appointed to represent Hall, Hall had been represented by prior counsel.  He had interviewed Hall and had required him to complete a nineteen-page questionnaire entitled "Client Background Information," in which Hall answered numerous questions about his social, vocational, scholastic, and medical history.  He also traveled to Hall's hometown of El Dorado, Arkansas, where he interviewed Hall's mother and other family members, a Reverend Hegler, Hall's adult probation officer from a prior criminal conviction, Hall's parole officer, and Hall's previous attorney. (Government Exhibit E at p. 2-3 and attached exhibit A.)  Prior counsel turned over to Hall's trial counsel both his notes of these interviews and the questionnaire. Defense counsel filed a motion requesting the appointment of

20

various experts, including a psychiatrist, a psychologist, a jury consultant, a forensic pathologist, and a mitigation expert. In a hearing held on July 14, 1995, believing that a jury consultant was of greater importance than a mitigation specialist, defense counsel dropped their request for a mitigation specialist.[2] This Court authorized funds for defense counsel to hire a psychiatrist, a psychologist, and a pathologist, but denied counsel's request for a jury consultant. (Government Exhibit E at 5-7.)

In August of 1995, an attorney who specialized in death penalty cases, Kevin McNally, provided defense counsel with the name of a mitigation specialist, Tena Francis. She was officially appointed by this Court on September 14, 1995, and she first met with defense counsel on September 15, 2005. She and defense counsel also met with Hall that day. Prior to the meeting with Francis, defense counsel Ware had met and spoken with Hall's mother, Betty Hall, and his sister, Cassandra Ross, in his office; and he had also spoken with Hall's previous Arkansas attorney, James Bennett. (Government Exhibit E at pp. 12-13, 19; Hall's Exhibits 11, 13.) Later, Ware traveled to Arkansas and again conferred with Betty Hall. (Government Exhibit E at p. 20.)

---

[2] In his affidavit, defense counsel Ware explains that he had, prior to Hall's case, never used a mitigation specialist in any of the several capital cases he had tried before, choosing instead to use the services of private investigators, mental health experts, and paralegals, as well as his own labor in order to discover and develop mitigating evidence. (Government Exhibit E at p. 10.)

21

After being hired, and prior to the punishment phase of the trial, which began on November 1, 1995, Tena Francis submitted two investigative memoranda to Michael Ware, dated October 23 and October 25, 1995. In the October 23rd memo, Francis outlines the substance of her interview with Tracy Hall, Hall's brother, who was at that time confined in a prison in Arkansas for aggravated assault. (Government Exhibit E, attached exhibit C.) In her October 25th memo, Francis outlines information that, as she states in the body of the memo, was gleaned through "extensive interviews with members of [Hall's] family, his minister, officials at school, neighbors, and other significant persons from [Hall's] life (for example, girlfriends)." This included information about Hall's: mother and father, A.J. Hall, including the violence in the home, their substance abuse, and their subsequent divorce; siblings Pamela, Scotty, Cassandra, Tracy, and Demetrius, as well as some half-siblings; birth and medical history; personality; relationship with his family; having four children by four different women; school history; limited work history; and criminal history, including parole from Arkansas state prison in 1993. At the end of the October 25, 1995 memo, which was entitled "Client Social History," Francis expressed her belief that the report was incomplete because there was not enough time to locate other witnesses; several members of the family were hesitant in answering the questions; and several members of the family were

22

hesitant to speak because of their knowledge and participation in Hall's drug activities. (Hall's Reply Exhibit #13 at pp. 1-13.)

At the punishment phase of the trial, defense counsel presented testimony from: an FBI agent and a police detective who testified about Beckley's and Demetrius Hall's involvement in the crime (R. 18:52-60); a police lieutenant and a highway patrolman from Arkansas who testified about Bruce Webster's involvement in the crime and his extremely violent history (R. 18:80-97); an operations manager from the federal detention center where Hall was housed, who testified, among other things, that he had no record of any disciplinary problems with Hall (R. 18:98-102); an employee of Kroger's who testified about Beckley's prior discharge for dishonesty (R. 18:106-08); and Hall's mother and sister, who testified about A.J. Hall's severe physical abuse of Betty Hall, Hall's good relationship with and love for his children, his good behavior while in prison in Arkansas, and his remorse for the crime. (R. 18:111-147.)

During the punishment phase, defense counsel questioned several government witnesses at the punishment phase of the trial about the fact that they had previously spoken with either defense counsel or the defense investigator, including: LaTonya Anders, the mother of one of Hall's children (R. 17:97-8); Sylvia Henry, Bruce Webster's girlfriend (R. 17:130); David Butler, a prosecutor from Arkansas who testified to Hall's bad reputation (R. 17:166); and Carolyn Dikes,

23

a lieutenant in the El Dorado police department who also testified about Hall's bad reputation (R. 17:177.)

*Analysis of First Ineffectiveness Claim:*
*Failure to Investigate*

While Hall criticizes his attorneys for failing to conduct enough investigation on their own and for failing to hire a mitigation specialist earlier, the record before this Court reveals that defense counsel had done a substantial amount of investigation into mitigating evidence prior to trial, including interviewing government witnesses and members of Hall's family, and that the mitigation specialist had over six weeks between the time of her appointment and the punishment phase began to investigate and develop potential mitigating evidence. Indeed, her investigation included traveling to Arkansas and, according to her own memo to defense counsel, interviewing numerous people there. And, while Francis and the other experts who submitted affidavits in support of this claim contend that a far greater amount of investigation was needed in this case, this Court would have been unwilling at the time of trial to authorize an unlimited amount of funds with which to conduct further investigation, especially where that investigation would have involved contacting witnesses who had minimal contact with Hall. This Court instead concludes that Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance. *See Lewis v. Dretke*, 355 F.3d at 367.

24

Hall next contends that his trial counsel made an unreasonable decision to emphasize, in the punishment phase of the trial, the statutory mitigating circumstance of "equally culpable co-defendants" and that they failed to adequately prepare Betty Hall and Cassandra Ross prior to their giving testimony at trial.  Under federal law, the fact that equally culpable co-defendants will not be punished by death is a mitigating factor that, if proven, *shall* be considered by the jury in determining whether a death sentence shall be imposed. *See* 18 U.S.C. § 3591(a)(4).  Defense counsel believed that it was a good trial strategy to emphasize this mitigating factor because Hall's co-defendants, Demetrius Hall;  Marvin Holloway; and most especially, Steven Beckley; were arguably equally culpable and had reached plea agreements with the government and would not be eligible for the death penalty.  Defense counsel Michael Ware believed, based on his experience, that jurors disliked the government "striking deals" with co-defendants and that North Texas jurors in particular tend to be conservative jurors who might therefore be more open to the equally-culpable-co-defendants mitigating factor as opposed to "excuse defenses" in a case such as Hall's where the facts were particularly gruesome. (Government Exhibit E at pp. 14-5.)

The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065.  In

25

viewing counsel's decisions from their perspective at the time of trial, the strategy of heavy reliance on the statutory mitigating factor, "equally culpable co-defendants," was a reasonable one.  From the bench it was clear that defense counsel were making the argument most likely to be persuasive to the jury--an appeal to its sense of fundamental fairness--and that the jury was attentive and responsive to it.  Besides, other statutory mitigating factors, such as duress, minor participation, absence of a prior criminal record, victim's consent, and impaired capacity, were not available to Hall. (Government Exhibit E at pp. 16-18.)  Also, it was a reasonable trial strategy for counsel to rely on their experience as criminal defense attorneys in reaching this decision.  And, finally, counsel also submitted non-statutory mitigation factors to the jury, such as Hall's age, his remorse, and the circumstances of his upbringing, so that the defense did not rely on one mitigation factor to the exclusion of all others. (R. 20A:25.)  Defense counsel were not ineffective in this regard.

Hall also contends that Betty Hall and Cassandra Ross were inadequately prepared as witnesses.  As support, he points to the length of their testimony and their being effectively cross-examined on certain issues, and to affidavits from both women. (Hall's Exhibits #15, 16.)  In their affidavits, Betty Hall and Cassandra Ross state that they had limited contact with the defense team, but also acknowledge that they met with defense attorney Michael Ware on more

than one occasion, met with mitigation specialist Tena Francis, and met with a psychiatrist who had been hired by defense counsel. They also state in their affidavits that they felt unprepared for giving their testimony, as they were not informed by Michael Ware until the same day as their testimony that they were going to testify about Hall's upbringing and the violence in the household. And, finally, they state in their affidavits that they would have given further information detailing the violence in the Hall household. (Hall's Exhibit #15 at pp. 1-3, 5-8; Hall's Exhibit #16 at p. 1-2, 4-6.)

The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present **enough** evidence of a certain type. *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). While Betty Hall and Cassandra Ross criticize the time that they spent with defense counsel and maintain that they were ill-prepared, the record of the trial reveals that they testified to much of what is contained in their exhibits. Specifically, at trial, Betty Hall testified that: A.J. was abusive towards her during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten and beaten after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police

27

were called several times, but arrested A.J. on only one occasion; that Hall would physically protect her from her husband; and that she stayed with her husband because she had small children and had no place to go, but she left when Demetrius was old enough to look after himself. (R. 18:113-116.) Cassandra Ross testified that: there was a lot of physical and verbal abuse during her childhood; that A.J. would beat her mother with boards and anything else he could get his hands on; that all of the children tried to stop the abuse and would call the police, but their father would snatch the telephone away; that she left the home at age eighteen, married and moved to Texas; and that she had Hall come and live with her for a while and go to school in Texas at one point. (R. 18:137-40.) While the government did cross-examine both women about Hall's criminal history, his lack of an employment history, the fact that all of the children were fed, clothed, and sent to church, and the fact that Cassandra Ross had never been in trouble even though she was raised in the same household, this type of cross-examination was to be expected and would have occurred no matter how many times the women met with defense counsel. Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not shown that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner.

Hall further argues that his trial counsel failed to develop and present mitigating evidence from Hall's father, A.J. Hall, his

28

two brothers, Scotty and Tracy, and his sister Pamela Palmer. (Second Amended Petition at 74-85.)[3] Defense counsel Michael Ware, however, explains in his affidavit that he made the strategic decision not to call these family members as witnesses. In particular, he decided not to call A.J. Hall as a witness because, although Ware had met with Hall's father, he was "absolutely opposed" to testifying and would not have likely made an effective witness, given Betty Hall's testimony about his violence towards her. (Government Exhibit E at p. 25.)  Ware made the decision not to call Tracy or Scotty Hall, two of Hall's brothers, based on interviews that Tena Francis conducted with them.  In particular, Tracy Hall, who at the time of the interview was in prison for firing a gun into a crowd and injuring nine people, was an admitted crack-cocaine dealer in El Dorado, Arkansas.  He told Francis that Hall had "taken him under his wing" in the drug-dealing business, that they had shared the drug-dealing business in El Dorado, and that Hall had taught him how to be smart about drug dealing. (Government Exhibit E at pp. 23-4, attached exhibit C at pp.1-2.)  Scotty Hall was also in prison for drug possession when he was interviewed by Francis, and Francis had learned that Scotty was a spouse batterer. (Hall's Exhibit 18 at p. 3, Hall's.

---

[3]    Hall has submitted declarations from these individuals and contends that A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and about how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up. (Hall's Exhibits #17-9, 25).

29

eply Exhibit 13 at p. 5.) Ware made the decision not to call Pamela Palmer as a witness because she was very unwilling to speak at length to Francis, as she was very angry at the time at Hall for lying to her about his involvement in the crime and for involving Demetrius Hall in the crime. (Government Exhibit E at pp. 22-23, Hall's Reply Exhibit 13 at p. 5.) It was reasonable for trial counsel to opt not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial.

Hall also asserts that his trial counsel failed to develop and present mitigating testimony from: Cassandra Ross's in-laws, Reverend Jerry and Gracie Ross, who were neighbors of the Hall family and could have testified about the violence in the Hall household (Hall's Exhibit #26, 27); Betty Hall's co-workers, who saw her at work after being beaten (Second Amended Petition at 87); A.J.'s sister, who could have testified about the slave history of their family and the abuse she endured as a child, as well as Betty Hall's illnesses (Second Amended Petition at 87); one of Betty Hall's sisters, who could have testified about A.J.'s violence towards Betty and about Betty's abandonment of her children after she left A.J. (Second Amended Petition at 88); two additional women with whom Hall fathered children, who could have testified about Hall's love for his children and his financial support of his children (Hall's Exhibit #29, 30);

30

and a teacher from the middle school Hall attended, who could have testified about his shock at hearing about the crime (Second Amended Petition at 92.)  Much of this evidence would have been cumulative of the testimony given by Betty Hall and Cassandra Ross and merely would have been further evidence of A.J. Hall's abuse of Betty Hall, something that the government did not dispute.  Some of this evidence, such as evidence about A.J. Hall's upbringing, would have been of little, if any, assistance to the jury in reaching its decision. And, with regard to some of this potential testimony, such as testimony from mothers of Hall's children and a middle school teacher about Hall's general good character, it is so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony. *See Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) (holding that Carter was not prejudiced by counsel's failure to investigate, discover and present the testimony of character witnesses, as there was no reasonable probability that testimony that he was a "good and peaceful person" would have resulted in a life sentence, given that Carter had confessed to two murders).  Hall has not established any prejudice as a result of his trial counsel's failure to discover and present this testimony.

Finally, Hall asserts that his trial counsel were ineffective for failing to investigate and present records from Hall's imprisonments in Arkansas and in federal prison and supporting testimony from prison guards and prison experts illustrating his good

31

behavior in prison in both the Arkansas state prison and federal prison. (Hall's Exhibit #34-38.)  As noted earlier, defense counsel did present testimony from an officer at the federal detention center that there was no record of any disciplinary problems with Hall while he was housed there.  Hall contends, however, that his trial counsel should have offered further evidence to support this, as well as testimony and evidence from Arkansas prison guards about his good conduct while incarcerated there.  In his affidavit, Michael Ware explains that he was hesitant to present such testimony because such witnesses would have had to concede on cross-examination that, in his earlier incarceration in Arkansas, Hall had been eligible for early release for "good time."  Moreover, Ware had been informed that Hall had actually continued his drug dealing business while in prison in Arkansas, and he was also aware that the government had rebuttal expert witnesses ready to testify about prison conditions and did not want to open the door to that testimony.  Instead, defense counsel opted to argue at closing that Hall would not be a future danger to society because his records from both stints in prison revealed no disciplinary problems and because there is no parole in the federal prison system. (Government Exhibit E at pp. 25-6; R. 20A:53, 78.)  Counsel exercised reasonable trial strategy in this regard, and Hall has not shown how further testimony on this subject would have resulted in a life sentence.  Hall has failed to establish ineffective assistance of counsel under the *Strickland* standard based on his

32

contention that his counsel failed to conduct an adequate investigation into potential mitigating evidence.

## 2.   Failure to Present Documentary Evidence

Hall also contends that his trial counsel were ineffective for failing to place certain documentary evidence into evidence at the punishment phase of the trial. Specifically, Hall asserts that trial counsel should have placed into evidence a hospital emergency-room record that documented injuries Hall's mother Betty Hall received in 1968 at the hands of his father, A.J. Hall, the record of his father's arrest in 1974 for assault and battery on Betty Hall, and a handwritten letter and a poem Hall sent to his daughter.

As noted earlier, trial counsel presented uncontested evidence, through the testimony of Betty Hall and Cassandra Ross, that Betty Hall was severely physically abused by her husband, that the police came to the house three times and A.J. Hall he was arrested once because of this abuse, and that Hall was a concerned and involved father. (R. 18:113-16, 119, 138-41.) Accordingly, the documentary evidence Hall contends should have been offered into evidence was cumulative of testimony that was given at trial. *See Brown v. Cain*, 104 F.3d 744, 751 (5th Cir. 1997) (holding that counsel was not ineffective for failing to locate and present additional evidence that would have been cumulative to the testimony of the defendant's mother and sister regarding his difficult past). Moreover, the government never contested the fact that Betty Hall was severely

33

physically abused by her husband, but instead argued that the abuse did not extend to Hall and that, even if it did, it did not excuse his actions. (R. 20A:92.)  Accordingly, defense counsel were not ineffective for failing to present documentary evidence that was cumulative of testimony already presented at trial and on a topic that was never in dispute.

### 3.   Failure to Call Available Witnesses

Hall complains further that his trial counsel were ineffective for failing to call as witnesses certain people who were known to counsel and were available to testify.  Specifically, Hall argues that counsel should have called Reverend D.L. Hegler, who was the Hall family's pastor during Hall's childhood, and Reverend Willie Ray Norful and his wife, the couple into whose custody Hall was released when he was paroled from prison in Arkansas. All of these people were in attendance at Hall's trial.  As support for this claim, Hall has submitted an affidavit from Reverend Hegler.

Hall contends that Norful and his wife could have testified that Norful gave Hall a job at his church so that he could be paroled from prison, the people in the church and the Norful family liked him, Hall kept Norful's son out of his drug trade when he began it again after being paroled, and that they believed that the crime was very out of character for Hall.[4]  Hall further contends that Hegler could

---

[4] This Court does not find in the record any declarations that Norful and his wife provided to habeas counsel indicating their willingness to testify on Hall's

34

have testified about the physical violence between Hall's parents as well as the alcohol abuse and infidelity; the poverty, drug trade, and racism in El Dorado, Arkansas; Hegler's surprise that Hall was involved in such a violent crime; and Hall's expressions of remorse to Hegler. (Hall's Exhibit #22.)

In his affidavit submitted as an exhibit with the government's response, defense counsel Michael Ware explains that he chose not to call Reverend Hegler as a witness for the defense because mitigation specialist Tena Francis interviewed Hegler on October 9, 1995, and in that interview Hegler stated, among other things, that: Hall was bright, but did not apply himself; Hall dropped out of school in order to pursue his drug dealing; Hall believed that he could beat the system and would therefore not get caught dealing drugs; Hall had a "lot of boys" selling cocaine for him in El Dorado; Hall was still dealing drugs while in an Arkansas state prison; the elderly people who lived near Hall's father were afraid of Hall; Hall's parents "went wrong" by always being there to bail him out of trouble; and Hegler felt that Hall used him to get released on parole when he had no intention of leading a legal life when he was released. (Government Exhibit E at pp. 21-2.) Notwithstanding what Reverend Hegler now says about Hall a number of years after Hall's trial, defense counsel exercised reasonable trial strategy not to call as

---

behalf and outlining their proposed testimony, and Hall does not refer to any such exhibits in his petition.

a witness someone who had this many negative things to say about their client. They were not ineffective in refusing to call Hegler as a witness and, had they done so and had the government performed competent cross-examination of Hegler, doubtless Hall would now be asserting counsel's incompetence for placing Hegler on the stand.

With regard to defense counsel's failure to call Reverend Norful or his wife as a witness, Hall has failed to establish either deficient representation or prejudice. While Ware does not specify his reasons for not calling Norful or his wife as witnesses, the information that Hall alleges that these potential witnesses could have provided is not necessarily mitigating evidence. For example, while Norful gave Hall a job at his church so that Hall could be paroled from Arkansas state prison, the record reveals that Hall in actuality returned to drug dealing. And, while the Norful family and the people in the church might have liked Hall personally, Hall obviously took advantage of their kindness and continued to violate the law on several occasions. Additionally, regardless of what Norful and his wife believed about Hall's character, Hall was clearly quite capable of raping, physically attacking, and burying alive an innocent sixteen-year-old girl. Their belief that he was not is immaterial. Thus, Hall has failed to show either prong of the *Strickland* standard with respect to his counsel's failure to call Reverend Norful or his wife as witnesses at trial. This claim is without merit.

36

4.    <u>Failure to Adequately Question Government Witnesses</u>

Hall also argues that his trial counsel were ineffective in their cross-examination of certain government witnesses. Specifically, Hall contends that his trial counsel could have elicited from Hall's brother, Demetrius Hall, testimony about their deprived childhood; could have elicited from LaTonya Anders, Hall's girlfriend, testimony about his concern for her, their daughter, and his other children; and could have elicited from Wendell Olden, an official from the school district where Hall attended school, testimony about the drug problem that pervaded El Dorado, Arkansas.

Demetrius Hall testified for the government at the guilt phase of the trial, while LaTonya Anders and Wendell Olden testified for the government at the punishment phase of the trial. Demetrius Hall testified about his involvement in the crime. On cross-examination, defense counsel elicited from Demetrius Hall testimony that Hall had turned himself in to the police, that Hall told Demetrius to tell the truth to the police, that the original plan was to get the money from the "Jamaicans" and no one knew that Webster was going to take the victim from her apartment, that Hall was not present when Webster, Beckley, and Demetrius sexually assaulted Lisa Rene, and that Demetrius believed that his brother was sorry for what he had done. (R. 13:230, 239-46.)

LaTonya Anders testified at punishment about a $13,500 cocaine purchase she attempted to make on Hall's behalf in Houston, after

she had given birth to Hall's daughter, when Hall was not allowed to leave Arkansas because he was on parole. She also testified that she and another friend of Hall were robbed at gunpoint before they completed the transaction. She further testified that she transported crack cocaine from Houston three different times for Hall and later helped transport marijuana for him, as well. (R. 17:57-71.) Anders testified regarding her knowledge about the kidnapping. (R. 17:77-91.) On cross-examination, defense counsel elicited from Anders, among other things, that Hall was a good father to her child, that Hall had always been good to her other child that was not his, that Hall treated his other three children well, and that Hall treated her and the other mothers of his children well. (R. 17:100-101, 111.)

Finally, Wendell Holden testified that he was the assistant principal at Rogers Middle School in El Dorado, Arkansas, as well as a city-council member, that he had known Hall since he was in junior high school, and that he had heard people speak about Hall and that Hall had a bad reputation in the community. (R. 17:169-71.) Carolyn Dykes, a lieutenant with the El Dorado police department also testified at punishment that Hall had a bad reputation in the community. On cross-examination, Dykes acknowledged that she had known Hall's family for a long time and knew that Hall's father had been a crack dealer for a long time. (R. 17:175-78.)

Hall has established neither deficient representation nor prejudice from the failure to further question Demetrius Hall, LaTonya

38

Anders, and Wendell Holden in an effort to elicit more mitigating evidence. As noted above, Demetrius Hall and LaTonya Anders gave very damaging testimony about Hall. While Hall faults his trial counsel for failing to question them about Hall's upbringing and specific instances of care he showed his daughter, their testimony illustrated that Hall was willing to involve his younger brother and the mother of his child in his drug dealing, even where their lives were in danger. Thus, defense counsel's representation was not deficient, as both of these witnesses gave mitigating testimony on cross-examination about Hall's remorse, about his lack of original intent to kidnap the victim, and about his love for his children. *Prejean v. State*, 889 F.2d 1391, 1898-9 (5th Cir.), *cert. denied*, 494 U.S. 1090 (1990) (holding that, where defense counsel did place certain evidence before the jury, counsel was not ineffective for failing to present more of the same). And, Hall has not shown a reasonable probability that any further testimony would have resulted in a life, rather than a death sentence.

Moreover, while Hall criticizes defense counsel for failing to question Holden about the drug culture in El Dorado, defense counsel did elicit from another government witness the fact that Hall's father was also a drug dealer. In any event, Hall has not shown how further testimony on this issue would have been mitigating evidence. After all, Hall committed murder partly in retribution for one of his drug deals having gone bad. Hall has not shown a reasonable probability

that any testimony about the fact that other young men were drug dealers in Hall's hometown would have lessened Hall's culpability in the minds of the jurors.  Hall has not established either prong of the *Strickland* standard with regard to this claim.

5.    Failure to Adequately Cross-Examine Larry Nichols

Hall contends that his trial counsel, Jeff Kearney, was ineffective in his cross-examination of government witness Larry Nichols at the punishment phase of the trial.  Specifically, Hall asserts that Kearney failed to impeach Nichols with his prior testimony from a trial of his co-defendants in a bank robbery in which he testified for the government.  Hall asserts that counsel failed to impeach Nichols with his previous testimony that he learned tips in improving his situation from other inmates in federal prison, that he was a drug dealer, that he committed numerous robberies other than the bank robbery for which he was arrested, that he owned at least five guns, and that he passed fraudulent checks.  Hall further asserts that his trial counsel was ineffective in failing to cross-examine Nichols about differences between the original statements he gave the FBI about Hall and his trial testimony.

At the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates in the Mansfield Correctional Center in the months leading up to Hall's trial.  Nichols further testified that Hall bragged about raping Lisa Rene, spoke about being a drug dealer in Arkansas, talked about a man he attempted to rob in

40

Arkansas, and spoke about beating women. Nichols also testified that Hall told him that he would kill Steven Beckley if he ever got the chance and told him that he had a plan to escape from custody that involved taking either one of his lawyers or a female guard hostage and using one of the shanks that was hidden in the jail. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.) Nichols also testified that, while the minimum sentence for the crimes for which he pled guilty was twenty-five years, there was a provision whereby his sentence could be lowered because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols further admitted that: his prior plea agreement also "settled up" five or six robberies he had committed in Louisiana; he had purchased the car used in the bank robberies from the proceeds of other robberies; he also had federal charges against him for transporting a stolen vehicle across state lines; in the robberies he carried either a .380 automatic or a Tech 9 assault rifle; he had also robbed fast-food places and convenience stores; and he had previously tried to convince one of his co-defendants in the robbery cases to sign a false affidavit stating that Nichols had nothing to do with the robberies. (R. 17:242-45,

41

248.)  Nichols also admitted on cross-examination that, while the sentence for the two crimes he had pled guilty to was twenty-five years, he had not yet been sentenced.  He further acknowledged that the government had already filed a motion with the judge presiding over his case for downward departure on his sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he was officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

In an affidavit submitted with the government's response, defense attorney Jeff Kearney explains that he had a copy of Nichols's testimony from the bank robbery trial, that he reviewed this testimony, Nichols's plea agreement, and the prosecution's file in that case, and that he questioned Nichols regarding several aspects of his testimony from that trial.  He also states in his affidavit that, in furtherance of his cross-examination of Nichols, he toured the Mansfield prison facility where Nichols and Hall were housed together and interviewed the jailers who found the hidden shanks that Nichols told the government about.  Finally, Kearney explains that, although Nichols denied some of his previous testimony, he admitted much of it, and Kearney made the decision not to "pin down" Nichols on all of his prior testimony because Kearney believed that the jury knew that Nichols was self-motivated and knew he was lying, and Kearney had determined that doing so would destroy the mood and tempo

42

of the cross-examination and would risk alienating the jury by "beating a dead horse." (Government Exhibit F.)

This Court finds that defense attorney Kearney made a reasonable strategic decision not to impeach Nichols on every difference between his prior testimony and his testimony at Hall's trial. This decision was made after fully reviewing Nichols's prior testimony and was therefore made with knowledge of inconsistencies in Nichols's testimony. The decision was also made in order to streamline cross-examination and therefore make it more effective. But counsel did elicit from Nichols his substantial criminal history, his previous attempt to have a co-defendant perjure himself in an affidavit, and his admitted desire to improve his own situation in life by testifying against Hall. Such a strategic choice, when it is made after a thorough investigation of the relevant facts, is virtually unchallengeable. *See Strickland v. Washington*, 466 U.S. at 690-91. Hall's trial counsel was not ineffective in his cross-examination of Larry Nichols.

## 6.   Failure to Interview Alonzo Airy

Hall next asserts that his trial counsel were ineffective for failing to seek a continuance in order to re-interview inmate Alonzo Airy, a potential punishment witness for the defense, after defense counsel were informed that Airy had been interviewed by the government and had apparently changed his story about Hall's behavior while incarcerated in federal prison. Hall further asserts this his trial

43

counsel were ineffective for failing to conduct further investigation and thereby discover other federal inmates who could have presented testimony favorable to Hall.

Before the government had concluded its case-in-chief at the punishment phase of the trial, but after federal inmate Larry Nichols had concluded his testimony for the government, during which he testified about Hall's lack of remorse while in federal prison and Hall's plan to escape from prison, the government requested that it be permitted to amend its witness list to add Alonzo Airy. Assistant U.S. Attorney (AUSA) Richard Roper explained to this Court that Alonzo Airy had only recently been interviewed by the government because he was on the defense's witness list that had been filed with the Court on the first day of trial. (R. 18:4.)  Roper further stated that he wished to call Airy as a witness for the government because he had corroborated Nichols' testimony when he spoke to FBI Agent Paul Shannon and AUSA Paul Macaluso a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.)  Defense counsel objected to the government's attempt to amend its witness list because the testimony would be cumulative of Nichols's testimony, because Nichols had not been impeached regarding Alonzo Airy as of yet, and because the government could cross-examine Airy if and when he was called by the defense. (R. 18:8.)  This Court denied the government's request to add Airy as a government witness (R. 18:14), and the defendant did not call him.

44

Airy had been listed as a defense witness because he had been interviewed by mitigation specialist Francis on October 22, 1995, when he told her that Hall had never discussed any escape plan and was extremely remorseful. Airy had also informed Francis that Nichols was constantly discussing his desire to have his sentence reduced and had stated that it was easy for an inmate to lie for the government in order to obtain a recommendation from the government that a sentence be lowered. (Hall's Exhibit 7.)  Hall has included as an exhibit with his petition an affidavit signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and Macaluso much of the information Agent Shannon included in an FBI-302 statement dated October 30, 1995.[5]  Specifically, in his new affidavit, Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon.  In Macaluso's affidavit, he states that he

---

[5]

Airy does not appear to dispute that he had a conversation with federal agents that day, but instead disputes what was said.

45

and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness. Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1995, is correct. (Government's Exhibit D.)

Hall contends that defense counsel were ineffective for not requesting a continuance so Airy could be re-interviewed and a determination made on whether he would give testimony that would be helpful. Also, with a continuance, Hall thinks other inmates could have been interviewed who would have been able to give testimony corroborating Airy's testimony about Nichols.[6] Putting aside the question of whether this Court would have granted a mid-trial continuance for this reason when two other similar requests for continuance had been denied, Hall has failed to establish any

---

[6] Hall has also submitted affidavits from two other inmates of the prison where Hall was housed prior to trial. These inmates state generally that Hall never spoke to them about any escape plans and never bragged to them about the crime, and that Nichols was known as a "snitch." (Hall's Exhibits #32, 33.)

prejudice as a result of defense counsel's failure to re-interview Airy and/or discover other federal inmates to testify for Hall. In this regard, even had the defense re-interviewed Airy and determined that Airy was willing to testify in a matter contrary to what was contained in the FBI statement, had he been called as a defense witness, the government would have, presumably, been able both to question Airy about the interview with Shannon and Macaluso and to call Shannon as a witness in order to impeach Airy. Hall has not shown that a credibility determination between Airy, a convicted federal felon, and Shannon, an FBI agent, would have been settled in Hall's favor.

Moreover, with regard to any other inmates who might have testified on Hall's behalf, Hall has failed to establish that, even had these inmates been located, their testimony would have so effectively impeached Nichols testimony that Hall would not have received the death penalty. First, as noted earlier, defense counsel already effectively impeached Nichols during cross-examination about his self-interested motivation. Second, these inmates could only testify about what Hall told them, not what Hall might or might not have said to Larry Nichols. Because Hall has not established the prejudice prong of the *Strickland* standard, this claim is without merit.

7.   Failure to Make a Closing Argument at the Guilt Phase

Hall argues that his trial counsel were ineffective in their decision not to make a closing argument at the guilt phase of the trial. Hall contends that, had trial counsel made a closing at the guilt phase of the trial, they could have "built a bridge" between the guilt and the punishment phases of the trial. Thus, even though counsel were in effect conceding that Hall was guilty of the offenses for which he was charged, counsel could have raised questions in the closing argument about the veracity of the testimony given by Hall's co-defendants and could have begun to argue at closing that these co-defendants were equally culpable.

As support for this claim, Hall points to two affidavits submitted by defense attorney Michael Tigar, one with the amended petition and one with Hall's reply to the government's response. In these affidavits, Tigar opines that defense counsel were ineffective for failing to give a closing statement at the guilt phase of the trial. Specifically, Tigar states that trial counsel should have given a closing statement at the guilt phase of the trial, highlighting co-defendant Steven Beckley's plea agreement, as well as his previous lies to the police and the inconsistencies between his previous statements to the police and his trial testimony. Tigar further states that trial counsel's decision not to make a closing statement at the guilt phase of the trial left the jury with only the government's theory of the case and did not adequately emphasize the defense's argument that Beckley was an equally culpable defendant

48

who was not going to receive the death penalty. (Hall's Exhibit 12 at pp. 9-12.)  And, Tigar states that, while the government would be expected to "land a few blows" in rebuttal, defense counsel were ineffective for not making a closing statement at the guilt phase in order to address those jurors not yet set on a death sentence for Hall. (Hall's Reply Exhibit 5 at pp. 19-20.)

In his affidavit, defense attorney Michael Ware states that he was aware of the concept of "building a bridge" between the guilt and punishment stages of the trial. He believed, however, that prosecutors are fully capable of doing the same and therefore he made a strategic decision not to make a closing statement at the guilt phase of the trial so that the government could not give another closing statement in rebuttal, which would have been the last argument the jury would have heard at the guilt phase. (Government Exhibit E at p. 28.)  Instead, defense counsel made an opening statement at the punishment phase of the trial, before the government opened its case-in-chief, in which counsel emphasized that Hall accepted responsibility in his confession, that there were others who were equally culpable against whom the death penalty was not sought, that Hall had four young children and had been a good father, that Hall had witnessed the physical abuse of his mother by his father, that Hall grew up hard and dealt drugs, but that this was a case of a situation getting out of hand and the appropriate sentence was life

49

in prison without the possibility of release rather than death. (R. 17:8-11.)

This Court finds that Hall's trial counsel did not render ineffective assistance of counsel in deciding not to make a closing statement at the guilt phase of the trial. This decision was made by experienced criminal defense attorneys, was made because the defense was not contesting Hall's guilt but was instead concentrating on the punishment phase of the trial, and was made for the strategic purpose of not providing the government an opportunity to give a rebuttal argument which would be the final argument the jury heard at the guilt phase. Moreover, Hall's concern that, because of this decision, the defense did not establish the framework for the punishment phase of the trial is answered by the fact that defense counsel made an effective *opening* statement at the punishment phase of the trial. Defense counsel were not ineffective in this regard. Besides, Hall has also not established that he was prejudiced by this decision, as he has not shown a reasonable probability that, by relying primarily on an opening statement at the punishment phase to make the case for life over death rather than upon a closing statement at the guilt phase, Hall received a death rather than a life sentence.

8.   Failure to Effectively Argue Right to Allocution

Hall contends that his trial counsel were ineffective for failing to effectively argue his alleged right to allocute before the jury.

Before the defense presented its witnesses at the punishment phase of Hall's trial, defense counsel argued to this Court that Hall had an absolute right to make a statement to the jury before the jury reached its decision on punishment under Rule 32(c) of the Federal Rules of Criminal Procedure.  They also cited a Fifth Circuit case, albeit a non-death penalty case, as support for this argument.  This Court denied defense counsel's request to allocute before the jury without being subjected to cross-examination on the basis that the federal death penalty statute did not provide for such a right and that Hall had no constitutional right to allocute. (R. 18:45-50.) On direct appeal, Hall argued that he had a right to make a statement of remorse to the jury under Rule 32(c) or, in the alternative, under common law.  Furthermore, Hall contended on appeal that he had a constitutional right to allocute and that, even if such a constitutional right did not exist, this Court had violated Hall's due-process rights by allowing the government to present victim impact statements that were not subject to cross examination, but did not give Hall the same opportunity. *Hall*, 152 F.3d at 391.  The Fifth Circuit denied each of these claims, holding that Hall did not have a federal statutory, common-law, or constitutional right of allocution and that this Court did not abuse its discretion in declining to permit the allocution. *Id.*, 152 F.3d at 391-98.

Hall now contends that his defense counsel were ineffective because, had counsel cited state death-penalty cases where the trial

court permitted such an allocution, there is a reasonable probability that this Court would have exercised its discretion and allowed Hall to make a statement of remorse to the jury without being subject to cross-examination. Hall further contends that, had defense counsel presented the proposed statement to this Court at the time the point was argued, rather than waiting until after trial to place the statement into evidence, this Court would have been persuaded to allow Hall to make the brief statement of remorse.

Contrary to Hall's argument, regardless of what state case law defense counsel might have presented to the Court supporting his position that a court has the *discretion* to allow a defendant in a death penalty case to allocute before the jury, this Court would not have granted Hall's request to allocute before the jury, no matter the content of the statement, without subjecting himself to cross-examination by the government. And, more importantly, on direct appeal the Fifth Circuit held that it was not error for this Court to deny Hall's request. Counsel were not ineffective for failing to argue more strenuously a point that was without merit. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections).

9. <u>Unreasonable decisions regarding expert witnesses</u>

Hall next argues that his trial counsel were ineffective in their request and use of experts with respect to the punishment phase of

52

the trial.  Specifically, Hall contends that his trial counsel were ineffective in first requesting a psychiatrist and psychologist rather than a mitigation specialist, in requesting a mitigation specialist too late in the process, by not having him examined by a neuropsychologist, and by failing to have someone testify about the impact that Hall's upbringing had on his behavior.

On July 14, 1995, defense counsel sought, and obtained, funds from this Court with which to hire both a psychiatrist and a psychologist to examine Hall.  Defense counsel also sought, but were denied, funds with which to hire a jury consultant, but were given funds to hire a forensic pathologist. (July 12, 1995, hearing at 10-13; Government Exhibit E at 5-6.)  Defense counsel hired forensic psychiatrist Dr. Lisa Clayton and neuropsychologist Dr. Randy Price.  Subsequent to this, in September of 1995, defense counsel sought, and obtained, funds with which to hire a mitigation specialist.  Dr. Clayton examined Hall and was prepared to testify for the defense, but the defense opted not to have her testify because this Court had ordered that, were she to do so, the government had the right to have Hall examined by its own expert. (Government Exhibit E at 7-8.)  Dr. Price examined numerous documents relating to Hall, but evidently did not examine Hall and was either unwilling to testify on Hall's behalf or felt that he was unable to give any testimony that would assist Hall. (Hall's Exhibits 7 & 13, Government Exhibit E at 8-9.)

Hall contends that there was evidence before defense counsel that indicated that he should be examined by a neuropsychologist, based on the fact that the mitigation specialist had discovered that Hall's mother was beaten when she was pregnant with Hall and may have also been abusing alcohol; and that Hall performed poorly in school, had been diagnosed with hearing problems as a child, and had a poor memory. (Hall's Exhibit #7 at 18-20.)  Defense counsel, however, did in fact hire a neuropsychologist so, in essence, Hall faults his counsel for not hiring another psychologist to examine him.

Hall also contends that an expert should have testified at trial regarding the effects that Hall's upbringing had on his personality and offers an affidavit from a social worker as support for this claim. (Hall's Exhibit 14.)  An offer of proof made by defense counsel after the trial, however, illustrates that this was the type of evidence that Dr. Clayton was prepared to give, but that she was not called to the stand because defense counsel made the strategic decision not to allow Hall to be examined by an expert hired by the government. (November 21, 1995 hearing; Government Exhibit E at 7-8.) Thus, Hall faults his trial counsel for not hiring *another* expert to testify generally, without having examined Hall, about how a history of family abuse and poverty caused Hall to enter the illegal drug trade.

First, Hall has failed to establish that his trial counsel were ineffective in their use of experts.  Defense counsel sought the

54

assistance of more experts than this Court authorized. While Hall contends that the mitigation specialist was not hired in a timely matter, this Court concluded earlier in this opinion that counsel were able to utilize the mitigation specialist. And, while neither the psychologist nor the psychiatrist testified on behalf of Hall, this was not due to any ineffective assistance on the part of defense counsel. *See Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (holding that counsel was not ineffective in making a strategic, informed decision to forego a psychiatric evaluation of the defendant to forestall the testimony of the state's expert psychiatric witness).

Second, Hall has failed to establish that he was prejudiced by the decisions that defense counsel made with respect to the use of experts. As Michael Ware notes in his affidavit, defense counsel were not allowed an inexhaustible amount of money with which to hire experts to assist them in their defense of Hall. (Government Exhibit E at pp. 5.) In fact, this Court denied defense counsel's request for a jury consultant when the government pledged not to use one; and defense counsel were not permitted to hire expensive experts at will and without a benefits analysis. While defense counsel might have reasonably argued to this Court that they should be permitted to hire another psychologist because their psychologist was either unwilling or unable to testify on Hall's behalf, it is highly doubtful that this Court would have entertained a request to hire a social worker to testify about Hall's upbringing after having already given

55

defense counsel funds with which to hire both a psychologist and a psychiatrist.

Even had this Court permitted defense counsel to hire another neuropsychologist to examine him *and* a social worker to testify generally about the effect his upbringing had on his behavior, Hall has failed to establish a reasonable probability that these experts would have discovered and testified about information that would have mitigated against the imposition of the death penalty such that Hall would have received a life, rather than a death, sentence. Hall has submitted declarations from a neuropsychologist who examined him on April 13, 2001; and from a social worker who reviewed Hall's and his siblings' education records, records of Hall's parents' divorce, his mother's medical records, unemployment data from El Dorado, a summary of the testimony in the case, Hall's previous arrest and prison records, and the numerous declarations that Hall has submitted from Hall's friends and relatives.

In his declaration, the psychologist does not state that Hall suffers from any mental disorder or is mentally retarded. Instead, Dr. Michael Gelbort states that, due to "markers" that Hall exhibited, he believes that Hall suffers from "neuropsychological impairment." Gelbort bases his opinion on the fact that, in the testing performed on him, Hall scored in the fortieth percentile in verbal intellect and the twelfth percentile in non-verbal abilities. Because of this, Gelbort believes that Hall has a lesser ability to exercise judgment

56

and to anticipate the consequences of his actions and would be someone who would benefit from supervision. (Hall's Exhibit #41 at pp. 3-4.)[7]

In her declaration, Jill Miller states that Hall was a victim of severe physical abuse at home and his mother suffered from health problems and depression; that Hall has learning disabilities; and that Hall was abandoned by his mother when she left his father and thus had responsibilities towards his younger siblings. She concludes, consequently, that these are some of the reasons why Hall began selling drugs. Miller also states in her affidavit that Hall was a good prisoner in Arkansas and that, at the time of Lisa Rene's murder, Hall had indicated that he wanted to leave the drug trade and obtain "gainful employment." (Hall's Exhibit #14 at pp. 15-16.) Miller also states that, because of his history of trauma, the lack of good role models during his upbringing, and the pervasiveness of the drug trade in his hometown of El Dorado, the lure of the drug trade was something that Hall could not resist. (Hall's Exhibit at pp. 24-25.)

Even had both of these experts testified at Hall's trial about the information contained in their declarations, there is no reasonable probability that the result would have been different. Quite simply, although this Court does not deny the claims that Hall

---

[7] There is a second declaration from Dr. Gelbort that was submitted as an exhibit with Hall's reply to the government's response. In this declaration, Gelbort explains why Hall's neurological impairment would not have been evident to defense counsel when speaking to Hall. (Hall's Reply Exhibit #15.)

is of below-average intelligence and that his upbringing was deprived, the facts of the crime and the witnesses who testified for the government at punishment belie the contentions that Hall was incapable of exercising judgment or that he only entered the drug trade to provide for his family and wanted to exit it as soon as possible. In fact, after Lisa Rene was abducted from her apartment, Hall was the one who directed that she be transported to Arkansas, oversaw her confinement in the motel rooms, helped to dig her grave, helped to kill her, gave Beckley and Demetrius Hall advice on how to avoid the police, and refused to tell the police about the location of Lisa Rene's grave. And he did all of this because money had been stolen from him during a *drug transaction*. And, with regard to Hall's criminal history, after previously being imprisoned in Arkansas on drug charges and being released into the care of a family friend, Hall returned to the drug trade, directing both the mother of his child and members of his family in the business. In short, explanations for why Hall entered into the drug trade nowhere near sufficiently mitigate against his abhorrent behavior while practicing his livelihood such that there is a reasonable probability that, had this testimony been placed before the jury, Hall would have received a life sentence. *See Kunkle v. Dretke*, 352 F.3d 980, 992-93 (5th Cir. 2003) (holding that trial counsel were not ineffective for failing to present sufficient evidence of the defendant's mental problems and his troubled home life given the limited weight the jury would

place on this evidence when compared to the defendant's history of criminal behavior and aggressiveness towards others). The Court concludes that this claim is without merit.

### 10. Failing to Adequately Argue Motions for Continuance

Hall asserts that his trial counsel were ineffective for failing to adequately argue the motions for continuance that they made to this Court. Specifically, Hall contends that counsel were ineffective with respect to a motion for continuance defense counsel made on August 2, 1995, approximately two months prior to trial, and two motions for continuance made during the punishment phase of the trial. This Court denied all three motions.

As the government notes in its response, Hall must show not only that his motions for continuance would have been granted had they been supported with greater evidence and argument, but he must also establish a reasonable probability that, had the motions been granted, counsel would have obtained a sufficient amount of additional mitigating evidence to have altered the death-penalty verdict. *McFadden v. Cabana*, 851 F.2d 784, 787-88 (5th Cir. 1988). This he has not done. First, this Court almost surely would not have granted these motions for continuance had they been argued and supported as Hall suggests.[8] Second, earlier in this opinion, this Court concluded

---

[8] Hall suggests that the first motion for continuance should have included defense attorney Michael Ware's professional schedule as support for the motion. However, Hall fails to present any evidence that Michael Ware's schedule prevented him from being ready for trial.

that Hall had failed to show a reasonable probability of a different outcome at sentencing had the additional mitigating evidence he now points to been admitted into evidence. Accordingly, Hall has failed to establish prejudice because his motions for continuance were denied, and Hall has therefore failed to establish ineffective assistance of counsel under the *Strickland* standard with regard to this claim.

### 11.   Making an Ineffective Closing Argument at Punishment

Hall further argues that his trial counsel were ineffective in their closing statements at the punishment phase of the trial. Hall contends that the two closing statements given by Michael Ware and Jeff Kearney were ineffective because an inadequate amount of time was spent arguing positive reasons why Hall's life should have been spared, such as his upbringing, his prior good behavior in prison in Arkansas, and his children. Hall further argues that the fact that the jury deliberated for over ten hours at the punishment phase is evidence that, had Hall presented more mitigating evidence at trial and argued it more forcefully in their closing statements, there is a reasonable probability that he would have received a life, rather than a death, sentence.

In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997). And counsel is not ineffective for

making the strategic decision to acknowledge a defendant's culpability and even concede that the death penalty would be justified in order to establish credibility with the jury. *Id.*  In the case at hand, defense counsel made closing statements that lasted for one hour. In these closing statements, they expressed sympathy for the victim's family, reiterated that Hall was guilty of the offense he was convicted of, and suggested that Hall's abusive home life and the harm that a death sentence would give to his children and his mother were circumstances that mitigated against a death sentence. (R. 20A:52, 55-6.)  Defense counsel also emphasized that, if given a life sentence, Hall would not be eligible for parole and would die in federal prison (R. 20A:53, 78.)  And, defense counsel suggested that the only people who would benefit from Hall's receiving a death sentence were his co-defendants and government witness Larry Nichols, who all testified in order to lower their own prison sentences. (R. 20A:56-7.)  Finally, defense counsel made an impassioned plea that the jury not accept the partnership that the government entered into with people who were criminals and liars in order to seek the death penalty against Hall. (R. 20A:60-82.)

While Hall disagrees with the overall trial strategy of defense counsel to emphasize the equal culpability of Hall's co-defendants, this Court has determined that this was a reasonable trial strategy. Defense counsel's closing statements helped support this trial strategy, as well as emphasizing other factors that the jury should

consider in reaching its decision. Accordingly, defense counsel's closing statements were not, taken in their entirety, ineffective closing statements. Moreover, Hall has failed to establish prejudice. Hall points to the fact that the jury deliberated for over ten hours as evidence that, had defense counsel made more effective closing statements in which Hall's upbringing was emphasized in greater detail, there is a reasonable probability that he would not have been sentenced to death. However, the fact that the jury deliberated for a substantial period of time militates just as forcefully toward the conclusion that defense counsel's closing statements were very effective, thereby creating issues that necessitated extensive deliberation. Hall's defense counsel were not ineffective in this regard.

12. <u>Failing to Conduct an Adequate Voir Dire</u>

Finally, Hall asserts that his trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate voir dire of prospective jurors. Hall, however, only argues generally that his trial counsel were ineffective during the voir-dire process because they failed to investigate in a timely manner certain mitigating evidence. Individual voir dire began on October 2, 1995. (R. 1.) As noted earlier, by that date defense counsel had met with Hall and members of his family several times and had the benefit of some investigation performed by Hall's previous attorneys. Thus, investigation into potential mitigating evidence had been conducted

prior to voir dire. But more importantly, Hall has failed to point to any particular act or omission committed by defense counsel during the voir-dire process that rendered their representation of him ineffective. (*See* Amended Petition at 143-45.) Without any support from the record for this claim, it is without merit.

*Summary as to Ineffective Assistance*

In summary, Hall was represented by two experienced criminal defense attorneys who had, prior to representing Hall, a total of thirty-five years of experience between them in criminal law. Each had tried numerous criminal jury trials in both state and federal court. Prior to Hall's trial, each had tried two other death-penalty cases to conclusion and had been involved in other capital cases where there was a mistrial or where the government did not seek the death penalty. (Government Exhibit E at 1, Exhibit F at 1-2.) Hall's attorneys conducted reasonable investigations in all areas of the case; requested and were appointed experts to assist them; vigorously cross-examined government witnesses at both stages of the trial, thereby questioning and examining the government's case against Hall; ably argued all objections and points of law; and eloquently defended their client in their closing statements. Hall received constitution-ally effective assistance of counsel at his trial, and his second claim for relief is therefore denied.

63

**C.    <u>Juror-Misconduct Claims</u>**

In his third through fifth claims for relief, Hall alleges various instances of juror misconduct.  In his third claim, Hall asserts that there was extraneous evidence or information introduced into the jury's punishment-phase deliberations.  In his fourth claim for relief, Hall contends that one of the jurors had *ex parte* contact with a member of the victim's family.  And in his fifth claim for relief, Hall asserts that there is an unacceptable risk that "at least one juror" voted for the death penalty based on sympathy for the victim and her family.  Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated by these acts.

*Law Applicable to Juror Misconduct*

The Supreme Court has stated that, with respect to claims that there was an impermissible outside influence on the jury, due process "means a jury capable and willing to decide a case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The Supreme Court has further stated that, with such claims, the issue that must be decided is whether the intrusion affected the jury's deliberations and thereby its verdict. *United States v. Olano*, 507 U.S. 725, 739 (1993).  A defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room unless these is no reasonable probability that the jury's verdict was influenced by the information. *United States v. Ruggiero*, 56 F.3d 647, 652(5th

64

Cir. 1995); *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990).

*Analysis*

Hall bases these claims on two incidents that allegedly occurred during the trial. First, Hall's sister, Cassandra Ross, has submitted an affidavit to this Court stating that she saw a television newscast during which one of the female jurors was interviewed. Ross claims that the juror told the reporter that, during the weekend break in punishment deliberations, she had a birthday party for her daughter and that she placed a candle on the cake in Lisa Rene's memory and she and the guests said a prayer for Lisa Rene. (Hall's Exhibit #42.) Second, Hall has submitted evidence, including copies of e-mails and letters, that one of the jurors at Hall's trial, Jacqueline Holmes, communicated with Hall by letter after his trial and told him that she had met the victim's mother in the hallway during the trial. (Hall's Exhibits #44-49.)  Hall contends that this evidence establishes that there was extrinsic information placed before the jury and there is a reasonable probability that the jury's verdict was influenced by the information. Hall further contends that Jacqueline Holmes's statements in letters and e-mails written by her indicate that she based her decision at the penalty phase of the trial on sympathy for the victim.

This Court conducted a hearing on these issues on June 7, 2004. At this hearing, Jacqueline Holmes testified under oath. She

acknowledged that she had communicated with Hall in prison by mail after the trial ended.  She also acknowledged that, in one of her letters to Hall, she stated that she met the victim's mother during the trial.  She further testified, however, that this statement was not true, that she never met the victim's mother, and that she included this statement in her letter in an attempt to encourage Hall to confide in her and respond to her inquiries.  Holmes further testified at the hearing that she did not host or attend a birthday party during the weekend break in deliberations at the penalty phase of Hall's trial, she was not aware of any other juror attending such a party, and she did not recall any discussions between the jurors about a birthday party. (*See* Record of June 7, 2004 hearing.)

With regard to Hall's allegation that a juror had *ex parte* communications with the victim's mother, the live, sworn testimony before this Court is that this communication did not occur, and this Court finds Holmes's testimony to be credible.  Accordingly, Hall has not established that any inappropriate *ex parte* contact occurred. With regard to Hall's allegation that extrinsic evidence was introduced into the jury room, Hall has made a specific allegation that a juror lit a birthday candle in honor of a murder victim and said a prayer in her memory.  Assuming that this allegation is indeed true, and a female juror other than Jacqueline Holmes attended the birthday party, it is not evidence that there was *any* outside influence on the jury.  Instead Hall offers merely *speculation* that

66

there may have possibly been some unknown person at the party who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a birthday party, much less any prayer offered on behalf of the victim. Hall has also failed to establish this claim.[9]

Finally, Hall contends that an "unacceptable risk" exists that Jacqueline Holmes's decision to recommend the death penalty for Hall was based on her sympathy for the victim and her family, rather than on the evidence. Hall bases this claim on statements that Holmes made in messages posted on a web site regarding the death penalty, and Hall has submitted these messages to this Court as exhibits. In particular, Holmes stated that she was the last person on the jury in Hall's case to vote in favor of sentencing Hall to death. She admits that she ultimately voted as she did because of the horror

---

[9] Hall makes two further contentions. First, he asserts that he has been unable to locate evidence to support this claim because this Court has previously denied him discovery on this issue. As noted in its earlier order denying Hall's request for discovery, further discovery was denied on this issue because Hall had failed to assert a *prima-facie* claim of juror misconduct, because Hall's contention that someone might have communicated something to the unknown juror at the birthday party was, and remains, mere speculation. Second, Hall appears to assert a further claim that religion played an impermissible part in the jury's verdict at punishment, given the juror's prayer for the victim at the party and testimony given at trial at the punishment phase of the trial regarding attending and being active in church. (R. 32:18.) As the government notes in its response, it never advocated the death penalty for religious reasons. And, the constitution is not violated merely because testimony regarding the victim's church attendance was offered into evidence. *See United States v. Bernard*, 299 F.3d 467, 479-80 (5th Cir. 2002). These contentions are without merit.

67

the victim suffered, Hall's attempts to hide the crime, and his lack of remorse. She discloses that she has struggled with her decision in the years since, that she will always remember the sadness of both the victim's and Hall's families, and that she stopped writing letters to Hall because she was "overwhelmed" by the emotions that the correspondence evoked. (Hall's Exhibits #44, 48.)

As support for this claim, Hall cites cases in which the trial court removed jurors from service due to their inability to serve because of mental illness, depression, or a nervous or emotional condition. These cases are not applicable in the instant case. In her web postings, Holmes spoke of struggling with her decision after the fact. This is not evidence that she voted in favor of the death penalty at the time of trial based on overwhelming sympathy for the victim and her family. Instead, she specifically stated that she ultimately voted to recommend the death penalty because of the horror Lisa Rene experienced in death and because Hall attempted to hide his crime rather than promptly expressing remorse. Her decision was therefore based on the circumstances of the crime and Hall's response to them. Hall has shown no constitutional violation based on Holmes's verdict. Hall's third through fifth claims for relief are without merit, and they are denied.

## D.  **Brady Claim**

In his sixth claim for relief, Hall contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), because

the government was in possession of mitigating and impeachment evidence but did not provide it to Hall.  Specifically, Hall asserts that the government knew that one of its witnesses, Larry Nichols, had additional criminal conduct and more experience as a government witness than what it revealed at trial, but that it did not inform defense counsel.  Hall further asserts that, contrary to Nichols's testimony, he had been placed in protective custody prior to the times he spoke with Hall at the Mansfield jail.  Hall contends that all of this additional information could have been used by the defense to impeachment Nichols, thereby discrediting his testimony.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the state violates a defendant's due-process rights under the federal constitutional.  And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

As noted earlier in this opinion, at the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates

69

in the Mansfield Correctional Center in the months leading up to Hall's trial. Nichols further testified about Hall's demeanor in prison and his statements that he would kill Steven Beckley if he ever got the chance and that he had a plan to escape from custody. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had approached an FBI agent with this information when he was in court regarding his own federal cases and that, after speaking about Hall to FBI agents and an AUSA on March 6, 1995, he was placed in protective custody when he returned to Mansfield because he was a "snitch." (R. 17:236-37.) He further acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.) Nichols also testified that there was a provision in his plea agreement with the government whereby the government could recommend that his sentence be reduced because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols acknowledged his numerous prior robberies, his ownership of guns, his purchase of a car with stolen money, and his attempt to convince a co-defendant to lie in an affidavit. (R. 17:242-45, 248.) Nichols also admitted on cross-examination that he had not yet been sentenced in his case. He further acknowledged that the government had already filed a motion

70

with the judge presiding over his case for a downward departure from his guideline sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he is officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

Hall contends that the government withheld the full extent of Nichols's prior criminal conduct from Hall's attorneys. Hall further contends that Nichols was in protective custody before, not after, he spoke to federal agents about Hall and that this information was withheld from Hall's attorneys. And Hall asserts that the government withheld information that Nichols was a "career informant" who had cooperated with the government in cases other than those of his two co-defendant bank robbers and Hall.

Hall asserts that the government knew about Nichols's other prior criminal conduct because Nichols disclosed it during his testimony at the trial of his co-defendants. In that regard, the record from Hall's trial reflects that Hall's attorney Jeff Kearney questioned and confronted Nichols with his testimony at his co-defendants' trial on more than one occasion. (R. 17:246-47, 257.) Furthermore, in an affidavit submitted with the government's response, Kearney states that he reviewed the transcript of Nichols' previous testimony and utilized this information in cross-examining Nichols. (Government Exhibit F.) Nichols's prior criminal conduct, as related by Nichols at the prior trial, was not withheld from the defense.

Hall contends that Nichols was in protective custody before he spoke to an FBI agent on February 28, 1995, about Hall. Hall bases this on the word "protect" which is in parentheses in the report FBI Agent Arthur Grovner filed regarding his conversation with Nichols that occurred in a federal courtroom. (Hall's Exhibit #1.) Hall has no other evidence of this allegedly withheld evidence, and Hall's supposition that this parenthetical notation indicates that Nichols was already in protective custody is belied by the text of the report, which states that Nichols informed Grovner that he was a cellmate with one of the Hall brothers. This allegation is without merit.

Finally, Hall contends that the government withheld information that Nichols was a career informant. Hall does not state where he learned this information and does not specify against whom Nichols cooperated as a government witness other than his co-defendants and Hall. Regardless, even were this allegation correct and even if the government knew that Nichols had acted as an informant in the past additionally to what he admitted on the stand, Hall has not shown that this information is material impeachment evidence. On cross-examination, Nichols was impeached by defense counsel Kearney not only with his extensive criminal history, but also his willingness to testify against others, including his previous associates, in order to improve his own situation. Hall has not shown a reasonable probability that, had the jury been provided even more evidence along

this vein, Hall would not have received the death penalty. Hall's sixth claim for relief is without merit and is therefore denied.

## E.   False-Testimony Claims

In his seventh and twelfth claims for relief, Hall argues that his constitutional rights were violated when the government presented false testimony from government witnesses Larry Nichols and Steven Beckley. Specifically, in his seventh claim, Hall contends that government witness Larry Nichols lied upon being cross-examined at the punishment phase of the trial when he testified that he never used any of the proceeds from his previous robberies to use drugs and was never told by other inmates about ways to help himself within the legal system. In his twelfth claim for relief, citing *Johnson v. Mississippi*, 486 U.S. 578 (1988), Hall contends that his death sentence violates the Eighth Amendment because it was based on false testimony given by government witnesses Larry Nichols and Steven Beckley.

The Supreme Court has held that the presentation of false evidence violates a criminal defendant's due-process rights. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). And this is true whether the presentation was intentional or through negligence. *United States v. Antone*, 603 F.2d

73

566, 569 (5ᵗʰ Cir. 1979), *citing Giglio v. United States*, 405 U.S. 150, 154 (1972).

In order to prevail on this claim that his constitutional rights were violated by the presentation of false testimony, Hall must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271. As evidence that Nichols lied at trial, Hall points to Nichols's testimony at the trial of his own co-defendants. (Hall's Exhibit #31.) As noted earlier, Nichols's prior testimony was available to defense counsel and was used in cross-examining him. But even if this Court were to consider the government's failure to correct Nichols's testimony on these points at Hall's trial an error under *Napue*, it was not material. Nichols's testimony at Hall's trial and the previous trial differed with respect to collateral matters that are not material to Hall's sentence. Regardless of whether Nichols used his illegal proceeds to purchase drugs, there was ample evidence of Nichols's prior criminal behavior placed into evidence, including numerous armed robberies, as well as the illegal possession of guns. And, regardless of whether someone counseled Nichols on how to avail himself of the system to improve his chances of lowering his sentence, there was ample evidence admitted of his willingness to initiate contact with the government in order to provide information against other defendants, as well as his willingness to testify against others with the express hope

of having his sentence reduced.  Indeed, in an affidavit submitted with this Court, defense counsel Kearney explains that, while he did have access to all of Nichols's testimony from his co-defendants' trial, he decided not to confront Nichols with all of the inconsistencies in his testimony at Hall's trial and the previous trial, no matter how minor, because Nichols had substantially admitted most of the impeaching information in his testimony at Hall's trial. (Government Exhibit F.)  Hall's seventh claim for relief is denied.

With respect to Hall's twelfth claim, the Supreme Court in *Johnson v. Mississippi*, 486 U.S 578 (1988), reversed a death penalty in a case where a prior felony conviction from another state was used to prove an aggravating circumstance at the sentencing phase of the trial and that prior conviction was later reversed.  Hall asserts that under this Supreme Court precedent, his death sentence is invalid because it is based on false testimony given by Larry Nichols at the punishment phase of the trial and by false testimony given by Steven Beckley at the guilt phase of the trial.  In addition to his assertions that Nichols lied, which are set forth in his seventh claim for relief, Hall asserts that Steven Beckley lied about the nature of Hall's involvement in the kidnapping and murder of Lisa Rene and that, while this testimony was given at the guilt phase of the trial, Hall's sentence was based in part on his allegedly false testimony.

As this Court noted earlier, all of the allegedly false testimony that Nichols gave at Hall's trial was not material to the sentencing phase of the trial.   With respect to Beckley's testimony, Hall asserts, without any supporting proof, that Beckley testified falsely that Hall was the leader of the group who committed the kidnapping and murder.   However, while Beckley did testify that Hall was one of the primary actors in the kidnapping who also, along with Beckley and Bruce Webster, participated in her murder, his testimony was corroborated to a large extent by the testimony of Hall's brother, Demetrius Hall, by the testimony of Marvin Holloway, and by Hall's confession to the police. (*See* R. 13:107-227; R. 14:45-57; R. 16:14-64.)   Hall has not shown that his death sentence was based on false testimony.   Accordingly, this Court denies relief with respect to these claims.

**F.    Government-Agent Claim**

In his eighth claim for relief, Hall asserts that his right to counsel under the Sixth Amendment was violated because the government used Larry Nichols as a government agent to elicit information from Hall to be used against him at trial.   Specifically, Hall asserts that, either with the direction or the encouragement of FBI Agent Grovner, Nichols elicited information from Hall between February 28, 1995, the day that Nichols initially approached an FBI agent about Hall, and March 5, 1995, the date Nichols met with FBI agents and prosecutors and related his information about Hall.

The Supreme Court has held that, after a criminal defendant's right to counsel has attached, the government cannot initiate any questioning of the defendant without the presence of his attorney, unless he has waived his right to have counsel present. *Brewer v. Williams*, 430 U.S. 387 (1977). This includes situations where the government uses a co-defendant who is cooperating with the government to elicit information after both have been indicted. *Maine v. Moulton*, 474 U.S. 159 (1985); *Massiah v. United States*, 377 U.S. 201 (1964).

Hall bases his contention that Larry Nichols was used as a government agent on "information and belief," but has consistently maintained that additional discovery is required to develop this claim. However, the government has submitted an affidavit from FBI Agent Grovner in which he states that he never encouraged or directed Nichols to elicit further information from Hall. Rather, Grovner states in his affidavit that Nichols related to him information that Nichols had already been given by Hall regarding the escape plan, and Nichols stated that he had more information that he wanted to tell the government. (Government Exhibit B.) And the statement made by Agent Grovner regarding his conversation with Nichols on February 28, 1995, reflects that Nichols told Grovner some, but not all, of the information he had gleaned from Hall. (Hall's Exhibit 1.) As Agent Grovner has specifically denied Hall's contention that he ever encouraged or directed Nichols to elicit information from Hall, and Hall has presented no evidence to the contrary, Hall's claim that

77

the government violated his Sixth Amendment right to counsel by using Larry Nichols as a government agent is without merit. Hall's eighth claim for relief is denied.

## G.    **False-Statement Claim**

In his ninth claim for relief, Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated when, during his trial, the government gave defense counsel a false statement from FBI Agent Shannon regarding Hall's fellow inmate Alonzo Airy. Hall further asserts that the information contained in the false statement caused defense counsel to decide not to call Airy as an impeachment witness against Larry Nichols at the trial's punishment phase. Hall argues that his sentence should be reversed because, had Airy been called as a witness for the defense, he would have effectively impeached Nichols's testimony about Hall's behavior while he was at the Mansfield jail.

As noted earlier in this opinion, before the government had concluded its case-in-chief at the punishment phase of the trial, but after Larry Nichols had concluded his testimony for the government, the government requested from this Court that it be permitted to amend its witness list to add Airy to the list, who had recently been interviewed by the government. (R. 18:4.) The government wished to call Airy as a witness because he had corroborated Nichols's testimony when he spoke to government agents a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense

counsel objected to the government's attempt to amend its witness list (R. 18:8), and this Court denied the government's request to add Airy as a government witness. (R. 18:14.)  Defense counsel did not call Airy as a witness.

Hall offers no case law as support for his assertion that his sentence should be reversed on the basis of this claim, but has included as an exhibit an affidavit, signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and AUSA Macaluso much of the information Shannon included in an FBI-302 statement dated October 30, 1995. Specifically, in his new affidavit Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon.  In his affidavit, Macaluso states that he and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness.  Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his

79

own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1994, is correct. (Government's Exhibit D.)

Hall does not allege that the government knowingly presented false testimony, as Airy did not testify for the government. Instead, Hall appears to be making a general prosecutorial misconduct claim, alleging that the prosecution committed misconduct when the prosecutors presented an FBI statement in order to convince the defense attorneys not to call Airy as a defense witness. The Fifth Circuit has stated that prosecutorial misconduct is not a ground for relief unless it casts serious doubt on the jury's verdict. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001). And any alleged prosecutorial misconduct must be examined in the context of the trial in which it occurred. *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994).

Hall alleges that the government's stated desire to call Airy as a witness improperly influenced defense counsel not to call Airy themselves. But to make a showing that the government infringed on his right to present a defense at the punishment phase of his trial,

80

Hall must show that the government's conduct substantially interfered with Airy's free choice to testify. *See United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997). And while the government cannot conceal exculpatory evidence from a defendant, the government is under no obligation to conduct the defendant's investigation for him. *United States v. Garza*, 165 F.3d 312, 315 (5th Cir. 1999); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990).

Hall has not shown that any government action interfered with Airy's decision or choice to testify. First, it is difficult to conceive why the government attorneys would have argued forcefully for the right to call Airy as a government witness knowing that he would give testimony substantially different than what the FBI agent recounted in his statement. Second, and more importantly, even if the FBI statement was a complete fabrication, when this Court denied the government's request to call Airy as a witness, defense counsel were free to do so and were certainly free to speak to Airy again and determine what testimony he was actually willing to give. Defense counsel, not the government, decided not to call Airy as a witness.[10] Accordingly, no prosecutorial misconduct alleged by Hall casts serious doubt upon the jury's verdict at punishment. Accordingly, this claim is without merit and it is denied.

---

[10]

As noted earlier in this opinion, the decision not to call Airy as a witness was an imminently reasonable one because, even if he contradicted everything in the FBI statement, the government was free to question him about the statement and call FBI Agent Shannon to impeach Airy's testimony. Surely, this would have undercut Hall's defense, not aided it.

**H.    Interference-with-Counsel Claim**

In his tenth claim for relief, Hall asserts that the government "arbitrarily interfered" with his Sixth Amendment right to counsel when the government informed his original trial counsel, Mark Daniel and Michael Heiskell, that Larry Nichols had told the government that Hall had a plan to escape by taking one of his attorneys hostage. Hall maintains that Nichols was an unreliable witness and that, had Hall's original attorneys been aware of his unreliability, they would not have withdrawn from the case. The government responds that there is no evidence that Nichols was an unreliable witness, that the government had an obligation to inform counsel about the information it had received about the escape plan, and that Hall had no constitutional right to be represented by any particular attorneys.

On October 28, 1994, Mark Daniel was appointed to represent Hall and on January 6, 1995, Michael Heiskell was appointed as co-counsel in the case. On March 8, 1995, these attorneys filed a motion to withdraw from their representation of Hall. On March 9, 1995, after conducting an *in camera* review of the issue, this Court issued an order granting the motion. Jeff Kearney and Michael Ware were subsequently appointed as new counsel for Hall. Hall's former attorneys requested to withdraw from the case when they were informed about an alleged plan by Hall to escape from custody by taking one of his attorneys hostage. (Government Exhibit E.) This information was obtained from fellow inmate Larry Nichols, who first spoke briefly

with FBI Agent Arthur Grover about the alleged plot on February 28, 1995, and then spoke in greater detail with both FBI Agents and prosecutors on March 7, 1995. (Hall's Exhibits 1, 2.)

Hall contends that the statement made by Nichols to the government, as outlined in an FBI-302 statement dated March 7, 1995, in which Nichols is quoted to have stated that Hall had a plan to escape from prison by taking one of his attorneys hostage, was an unreliable statement by an unreliable witness. The only evidence that Hall has submitted to this Court in an attempt to establish that Nichols' statements to authorities about the escape was unreliable are sworn declarations from other fellow inmates Charles May, Javier Solis, and Alonzo Airy. May, Solis, and Airy all assert in their statements that they were inmates with Hall at the Mansfield Detention Center for unspecified time periods and that they never heard him speak about an escape plan and did not believe that he would have said this to anyone else. (Hall's Exhibits 32, 33, 40.) In his affidavit, Airy also states that Nichols had urged him to claim that Hall had spoken to him about an escape plan. (Hall's Exhibit 40.) All three of these affidavits were signed in 2000.

None of this evidence presented by Hall conclusively establishes that Nichols's statement to the authorities about the alleged escape plan was false, as all of the statements state only that Hall never spoke to them about any escape plan. More importantly, however, none of this evidence shows that the government had any specific reason

83

to disbelieve Nichols when he spoke to FBI agents and prosecutors on March 7, 1995. As noted by the government in its response, Hall's previous attorneys were informed immediately about the alleged plan because it had a direct bearing on their safety. As their motion to withdraw was filed with this Court on March 8, 1995, it is clear that Hall's prior attorneys acted immediately on the information provided to them. Any statement or declaration made in 2000 questioning the accuracy of Nichols's statements about Hall have no bearing on whether such an escape plan was a possibility in March of 1995.

Moreover, and most importantly, Hall has shown neither any constitutional violation in the government's reasonable action of informing defense counsel about possible dangers in their representation of Hall nor in defense counsel's request to withdraw from representing Hall. The Fifth Circuit has consistently held that a criminal defendant has no constitutional right to be represented by a particular attorney. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also United States v. Breeland*, 53 F.3d 100, 106, n. 11 (5th Cir. 1995). Without any proof of a constitutional violation, this claim for relief must fail. Hall's tenth claim for relief is denied.

## I.    Selective-Prosecution Claim

Finally, in his eleventh claim, Hall, in essence, makes a selective-prosecution claim. Specifically, Hall contends that the

government violated his constitutional rights under the Fifth and Eighth Amendments because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Hall bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races.

### Applicable Law

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

### Analysis

At trial, Hall made a pre-trial motion to dismiss the government's notice to seek the death penalty because of racial discrimination, along with a request for discovery of information

regarding the government's decision-making in death-penalty cases. In response, the government argued that there were an insufficient number of federal death-penalty cases to support either Hall's allegation of racial discrimination or the request for discovery. This Court denied the motion and Hall's discovery request.

In support of his contention that the federal government has used ethnicity as a factor in seeking the death penalty, Hall now on habeas review points to statistics maintained by the Federal Death Penalty Resource Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant. And, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. (Second Amended Petition at 192-93.)

This statistical evidence is insufficient to establish a *prima-facie* selective-prosecution case. In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented a Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," as support for a selective-prosecution claim and ruled that this evidence was not sufficient to establish a *prima-facie* case. This report reflected that, between 1995 and 2000, the Attorney General of the United States authorized

159 death-penalty prosecutions from 682 potential death-penalty cases. With respect to the race of the defendants, of those 159 cases, there were forty-four white defendants, seventy-one black defendants, thirty-two Hispanic defendants, and twelve "other" defendants. *Jones*, 287 F.3d at 333-34.

Moreover, on direct appeal in the case of Hall's co-defendant, Bruce Webster, the Fifth Circuit denied a similar claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted, because he had not shown that other similarly situated individuals were not prosecuted for the death penalty, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence, consisting of statistics showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the presumption of good faith on the part of the prosecution. *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999).

Hall presents to this Court similar statistics to those that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution. This Court is not at liberty to rule otherwise, so Hall's eleventh claim for relief is denied.[11]

---

[11]

Hall, conceding that his statistics are insufficient to demonstrate purposeful discrimination, further asserts that this Court should grant him the right to conduct discovery on this issue. But in both his previous motion for discovery and here, while Hall has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African-Americans,

## VI

### *Request for Evidentiary Hearing*

This Court held an evidentiary hearing on Hall's third, fourth, and fifth claims for relief on June 7, 2004. Hall also requests that this Court conduct an evidentiary hearing on the remaining claims he raises in his motion. Section 2255 does not automatically require a hearing to dispose of every motion made under its authority. *Coco v. United States*, 569 F.2d 367, 369 (5th Cir. 1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). Conclusive, rather than direct evidence, however, is required in order to deny relief without a hearing. *United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990). Bona-fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States*, 507 U.S. 243 (5th Cir. 1975); *Reagor v. United States*, 488 F.2d 515 (5th Cir. 1973).

The record before this Court, including the exhibits submitted by Hall with his motion, do not create any contested fact issues with

---

he has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Hall has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong*, Hall's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery. *Armstrong*, 517 U.S. at 465, 468.

regard to Hall's remaining claims that must be resolved in order to decide his case.  To the contrary, many of Hall's claims are based on the record from the trial.  And, with regard to the claims for which Hall has submitted additional evidence, the Court has decided these claims based on information that remains uncontested, by assuming that what Hall alleges is true, or based on legal, not factual, bases.  Accordingly, because the record before this Court shows conclusively that Hall is not entitled to relief, his request for an evidentiary hearing on his remaining claims for relief is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED August **24**, 2004.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be