IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | § | |
|     Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:00-CV-422-Y |
| | § | (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § | (death-penalty case) |
|     Respondent. | § | |

**ORDER DENYING DEFENDANT'S MOTION FOR AUTHORIZATION OF FUNDS TO
PREPARE CLEMENCY APPLICATION TO THE PRESIDENT OF THE UNITED STATES**

Pending before this Court is a motion filed on November 2, 2009, by Defendant Orlando Cordia Hall ("Hall"), appearing by and through appointed counsel, entitled "Defendant's Motion for Authorization for Funds To Prepare Clemency Application to the President of the United States and Brief in Support."  In this motion, Hall requests authorization of funding for the purpose of preparing his federal clemency application.  For the reasons discussed below, the instant motion is DENIED.

**I.  Background**

Hall was convicted by jury of federal charges of kidnapping resulting in death, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and carrying a firearm during a crime of violence. After the jury unanimously recommended that Hall receive the death penalty, this Court imposed the death penalty for the kidnapping conviction, life imprisonment for the conspiracy conviction, and sixty

months' confinement for each of the remaining two convictions. Hall's convictions and sentences were affirmed on direct appeal, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), and the United States Supreme Court denied a petition for writ of certiorari. *Hall v. United States*, 526 U.S. 1117, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999). Hall then returned to this Court to file a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, which was denied. *Hall v. United States*, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004). The Fifth Circuit then denied petitioner's application for a certificate of appealability. *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006). The Supreme Court once again denied a petition for writ of certiorari. *Hall v. United States*, 549 U.S. 1343, 127 S.Ct. 2029, 167 L.Ed.2d 772 (2007). Although he has exhausted his federal appeals, Hall's execution has been stayed by the D.C. Circuit in *Roane v. Mukasey*, No. 1:05-cv-02337-RWR-DAR (D.C. Cir. Order dated Dec. 6, 2007). It is unclear when this stay will be lifted.[1]

## II.  Applicable Legal Standard

Title 18, U.S.C., § 3599 sets forth the circumstances under which indigent death-penalty defendants may receive government funding in connection with clemency proceedings. Because Hall is primarily

---

[1]  Although the stay is currently in effect, in light of the fact that Hall will have 45 days to file his application for executive clemency once his execution is scheduled, the Court determines that his motion is not premature and will consider Hall's requests.

requesting funding for services provided by individuals other than his attorneys, the Court's review of his request is governed by two provisions of section 3599. The first of these, subsection (f), provides, in relevant part:

> Upon a finding that investigative, expert, or other services are *reasonably necessary* for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g).

18 U.S.C. § 3599(f) (emphasis added). Subsection (g), in turn, sets a presumptive limit of $7,500 on services funded in a case under section 3599(f). *Id.* at § 3599(g)(2). This limit may only be exceeded if the Court certifies the additional fees and/or expenses as "necessary to provide fair compensation for services of an unusual character or duration" and the chief judge of the circuit approves the excess amount. *Id.*

Clearly, the threshold issue a court must decide in determining whether to authorize funding for the requested services is whether the services are "reasonably necessary." *See* 18 U.S.C. § 3599(f). Where, as has typically been the case, a petitioner requests funds for investigative or expert services related to the drafting of a habeas petition, "[g]enerally, courts have focused on the specificity with which petitioners have framed their requests[,] noting particularly whether the proposed investigative or expert services

3

can be tied to viable habeas claims of a constitutional magnitude."
*Hines v. Cockrell*, 2001 WL 1661670, at *1 (N.D. Tex. Dec. 26, 2001)
(citing cases discussing standard in context of 21 U.S.C. § 848(q)(9),
which contained provisions identical to those now found in section
3599(f)).[2]  Obviously, these holdings are not directly applicable
in the clemency context, as the president of the United States is
not limited to considering issues of a constitutional magnitude in
his review of a federal clemency petition. *See , e.g., United States
v. Libby*, 495 F.Supp.2d 49, 51 at n.1 (D.D.C. 2007)(recognizing that
"it is certainly the President's prerogative to justify the exercise
of his constitutional commutation power in whatever manner he chooses
(or even to decline to provide a reason for his actions altogether)").
Still, similar guidelines have been applied in the clemency context,
as one court has denied section 3599(f) funding to a petitioner where
"[n]one of the arguments advanced...[were] sufficient to make a prima
facie showing that some material information would be developed
[through the services requested] sufficient to assist [the petitioner]
in making a case for clemency." *Fautenberry v. Warden*, 2009 WL
2132638, at *6 (S.D. Ohio Jul. 11, 2009).[3]

---

[2] Pursuant to the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub.L. No. 109-177, 120 Stat. 192 (2006), the provisions of 21 U.S.C. § 849(q)(9) were replaced with identical provisions now set forth in 18 U.S.C. § 3599(f).

[3] The paucity of caselaw regarding section 3599 funding requests in the context of clemency proceedings is at least partially attributable to the fact that numerous courts, including those of the Fifth Circuit, were of the opinion that section 3599 was inapplicable to state clemency proceedings until the United States Supreme Court held otherwise earlier this year in *Harbison v. Bell*,___U.S.___, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009).

4

Although the "reasonably necessary" standard remains amorphous, particularly in the clemency context, some general guidelines developed by the courts apply in all situations.  The Fifth Circuit has repeatedly stated that a movant must demonstrate a "substantial need" for the requested service in order to satisfy the "reasonably necessary" requirement.  *See Powers v. Epps*, 2009 WL 901896, at *2 (S.D. Miss. Mar. 31, 2009)(citing *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004), *cert. denied*, 125 S.Ct. 866 (2005)(citing cases defining "reasonably necessary" in prior identical version of section 3599, albeit in habeas context)). Courts have also consistently denied section 3599(f) funding in both habeas and clemency contexts where the petitioner's request is intended to investigate "speculative" claims based on "mere suspicion and surmise" or amounts to a "fishing expedition."  *Bradford v. Johnson*, 162 F.Supp.2d 578, 580 (N.D. Tex. 2001) (quoting *Patrick v. Johnson*, 48 F.Supp.2d 645, 647 (N.D. Tex. 1999)); *DeLong v. Thompson*, 790 F.Supp. 594, 616-17 (E.D. Va. 1991) (denying investigative assistance because proposed investigation constituted a "fishing expedition"); *see also Fautenberry*, 2009 WL 2132638, at *4 (denying request for funding of neuropsychological evaluation for use in state clemency proceeding where comprehensive neuropsychological evaluation already existed and petitioner did not "make any demonstration beyond pure speculation" that any changes had occurred in thirteen years since original evaluation that would necessitate a new evaluation). In addition, courts have declined to

5

grant funding for duplicative work aimed at gathering additional information to be presented in a clemency petition where the claims were already developed in other court proceedings. *See Woods v. Thaler*, 2009 WL 3756847, at \*6-7 (W.D. Tex. Nov. 6, 2009)(services of psychologist, who was to prepare an affidavit regarding the petitioner's mental deficits for submission with state clemency petition, were not "reasonably necessary" because the claims petitioner sought to develop had already been adequately developed before state and federal courts); *Fautenberry*, 2009 WL 2132638, at \*4. Given the sparse guidance in the statute and caselaw, much is left to the discretion of a district court, as the only Texas court to address a section 3599(f) funding request in the clemency context has observed. *See, e.g., Woods*, 2009 WL 3756847 at \*5 (recognizing lack of direction provided by statute and caselaw with regard to section 3599(f), but declining to set forth more specific standard).

Even if a movant succeeds in showing that services are "reasonably necessary," the court may not exceed the statutory limit of $7,500 per case unless the movant shows that the funding is "necessary to provide fair compensation for services of an unusual character or duration" and permission is granted by the chief judge of the circuit. 18 U.S.C. § 3599(g)(2). What constitutes a service of "an unusual character or duration" is unclear, as no court has attempted to delineate the contours of this standard. However, because the Court determines that none of the services requested by

Hall are "reasonably necessary," the court need not reach this question.

### III.  Requested Services Not "Reasonably Necessary"

Hall has requested a total of $50,000 in services under section 3599(f) to cover the services of an investigator, two experts and a videographer.  He also requests permission to purchase various flights for these individuals and counsel at government rates.  As discussed below, none of the requested services are "reasonably necessary."

### A. Investigator To Perform Interviews of Potential Clemency Witnesses (≤$15,000)

Hall first requests up to $15,000 in funds to hire an investigator to interview "potential clemency witnesses," including family members, Bureau of Prisons ("BOP") personnel, and himself. (Mot. at 4-5). Although he acknowledges that some of these witnesses have previously been interviewed in connection with his case (concerning his upbringing and the development of mitigation witnesses prior to his 1995 trial), he claims that the scope of the clemency-focused interviews will be broader and states that his children have never been interviewed. (*See id.*). He specifically identifies three new topics he seeks to have investigated: (1) how his execution will impact his family; (2) whether his "deep remorse" for his involvement in the murder justifies mercy; and (3) whether he has successfully

7

adjusted to incarceration since his conviction.  (*See id.* at 4-5). He estimates the costs at "no more than $15,000," which would cover the investigator's time spent in locating witnesses, preparing them for interviews, and conducting the interviews, as well as the investigator's trips to various states where the family members reside and to Terre Haute, Indiana, where Hall and prison personnel are located.  (Mot. at 5).

Hall has not demonstrated that the services of an investigator are "reasonably necessary" to develop the evidence sought.  He first seeks evidence from his family members, apparently in support of his arguments that his execution will impact them and that he is remorseful.[4]  However, he fails to explain how the services of an investigator are "reasonably necessary" given the fact that he could gather substantially similar evidence regarding these issues by requesting sworn affidavits from his family members.  *See, e.g., Dowthitt v. Johnson*, 230 F.3d 733, 758 (2000), *cert. denied*, 121 S.Ct. 1250 (2001) (discussing ease with which affidavits from family members may be gathered by a prisoner for presentation in state habeas proceedings).  To the extent that Hall is arguing that he requires an investigator to *locate* family members, any family member whose location is unknown to Hall would likely not be appreciably affected by his execution and would be unaware of Hall's level of remorse.

---

[4]  To the extent Hall seeks funds to support the discovery of information duplicative of that already sought in prior interviews, this request is rejected.

In addition, Hall's belief that any of his family members would provide favorable testimony appears to be based on pure speculation. The only family members Hall specifically identifies as potential witnesses are his children, and it is unclear whether their statements would assist Hall in any way.  Hall also appears to be asking for money to fund the investigation of other unidentified family members, but such an investigation would amount to an impermissible "fishing expedition."   (*See* Mot. at 4).   The Court will not grant an investigator *carte blanche* to shake every branch of Hall's family tree in the hopes of finding favorable evidence.

Hall further seeks funding of investigator interviews with BOP officials, apparently for the purpose of showing his successful adjustment to his incarceration and, possibly, to support his claim that he is remorseful.  This request is denied for several reasons. First, Hall can provide better evidence of his behavior in prison through the presentation of BOP behavior records.  Such records, which would provide accounts of his behavior throughout his nearly 15-year incarceration, would be more comprehensive and persuasive than testimony from individual BOP officials who encountered him at random times during his imprisonment.[5]  Also, as with his family members, any BOP official who supports Hall's quest for clemency would likely be willing to provide a sworn affidavit attesting to his good behavior

---

[5] In fact, the U.S. Attorney's Manual Standards for Consideration of Clemency Petitions identifies "prison progress reports" as potentially useful documents in determining whether clemency is appropriate.  U.S. Attorney's Manual § 1-2.111, available at www.usdoj.gov/pardon/petitions.htm.

in prison and/or his remorsefulness.  Finally, Hall does not specifically identify a single BOP official who would provide favorable testimony, and his assertion that an investigator could ferret out favorable evidence from BOP personnel is based on pure speculation.

As for Hall's request for funding for an investigator to interview him, this request is also denied.  Hall can provide any information necessary to the presentation of his clemency petition in the form of a sworn affidavit.

**B.   Expert To Review and Evaluate Incarceration Records ($7,500)**

Hall next requests $7,500 to pay an expert to "review and evaluate [his] incarceration records since his conviction in 1995 with an eye toward offering an opinion about [his] adjustment to incarceration and to comment on the reliability of the 'future dangerousness' prediction urged by the Government and found by the jury at the time of [his] sentencing hearing in 1995."  (Mot. at 5). According to Hall, the available evidence from the BOP regarding his behavior in prison during his incarceration since his conviction "tends to prove" that he would not be a future danger to society, and expert testimony regarding how this evidence should be weighted would support his clemency application.  (*Id.*).

Hall requests that this expert be paid to provide two services, neither of which is "reasonably necessary."  First, he asks that the

10

expert review and evaluate his incarceration records.  However, counsel are just as capable of synthesizing the raw record data as an expert would be.  BOP records are sufficiently transparent to allow a layman to determine whether the records show a prisoner has exhibited "dangerous" behavior while in prison.  Hall also asks that the expert be paid to submit an assessment of how much weight should be accorded this evidence.  However, there is no reason to believe that the president and his staff could not properly determine the import of incarceration records, which are commonly presented with clemency petitions for similar purposes, without the assistance of an expert.  See note 5, *supra*.  In fact, the Supreme Court has expressed some doubt as to the validity of expert opinions regarding future dangerousness.  *See Barefoot v. Estelle*, 463 U.S. 880, 901, 103 S.Ct. 3383, 3398-99, 77 L.Ed.2d 1090 (1983) (ultimately concluding such expert opinions should be admissible in court proceedings because adversary process capable of sorting out reliable from unreliable evidence).  Moreover, Hall assumes that the expert would conclude that the evidence contained in the prison records should be weighted more heavily than other evidence of his behavior.  There is no reason to believe this speculative assumption is true: an expert could just as easily conclude that Hall had limited opportunities to be dangerous to others while on federal death row and/or made efforts to control his behavior during the pendency of his various appeals in hopes of reducing his sentence.

11

### C.   Expert To Perform Polygraph Examination on Hall ($7,500)

Hall also requests $7,500 for a polygraph examiner for the purpose of refuting testimony elicited at trial regarding his "future dangerousness."  (See Mot. at 5).  At trial, fellow inmate Larry Nichols testified that Hall, while confined before trial, told Nichols that he planned to escape by taking his own lawyers hostage.  (*See id.* at 5-6).  Hall contested these allegations in his section 2255 motion and now asks that the court pay for a polygraph expert to examine him about Nichols's allegations for the purpose of showing that he never contemplated or planned an escape and, thus, that the jury erred in entering its finding of "future dangerousness."

Hall has not shown that a polygraph examination would yield material information sufficient to assist in his clemency proceeding. First, as Hall admits, there is "disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence."  (See Mot. at 6 n.3 (quoting *United States v. Scheffer,* 523 U.S. 303, 310-311, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998)).  Given the substantial doubt regarding the reliability of polygraph evidence, it is unclear whether the president would even consider such evidence.

Even assuming the president would consider the polygraph evidence--and assuming the evidence would favor Hall--the results of the proposed polygraph test would not be of material significance

to the president's clemency decision.  Hall cites to a number of situations in which state governors have considered polygraph evidence in making clemency decisions.  (See Mot. at 6-7 n.3).  However, in all of these cases, the polygraph evidence supported the petitioners' claims of innocence.  (*See id.*).  Here, Hall does not seek polygraph evidence for the purpose of contesting his guilt; instead, the proposed evidence would merely support his claim that he did not contemplate or plan an escape attempt before his 1995 trial.  This is not the type of polygraph evidence upon which decisions to grant clemency have been based.  Moreover, should the president wish to evaluate Hall's future dangerousness, better evidence than the polygraph evidence sought is already available.  The BOP records of Hall's 14-year history of behavior in prison would provide far more compelling evidence of past and future dangerousness than the proposed polygraph evidence limited to refuting Nichols's 14-year-old allegations.

**D.  Video Production Service ($20,000)**

Hall additionally requests $20,000 for the purpose of hiring a professional videographer to videotape interviews with the witnesses and experts discussed above, as well as Hall himself.  (See Mot. at 7).  Hall asserts that such presentations are "now a routine part of the clemency process in capital cases" and alleges, "on information and belief, [that] each of the other death-sentenced federal prisoners

13

who has completed all post-trial appeals is represented by counsel who have adequate financial resources and are using them, *inter alia*, for this purpose." (*Id.*).  In light of these facts, Hall argues that he will be placed at a comparative disadvantage with other prisoners seeking clemency if denied funding for a video presentation.

As discussed above, to the extent family members, friends, and correctional officers are willing to provide statements on Hall's behalf in his clemency proceeding, these statements can be effectively presented through sworn affidavits.  Hall can also submit a sworn statement of his own with his clemency application.  Even if expert testimony were "reasonably necessary," such testimony could also be provided through sworn affidavits and reports.  Hall cannot show a need--and certainly cannot show a "substantial need"--for a videographer given the fact that all of the evidence he seeks to submit on videotape can be presented through other means.

Although Hall indicates that other federal prisoners are submitting video presentations with their clemency petitions, nowhere does he claim that any of these video presentations have been paid for or are being paid for with federal funds.  (See Mot. at 7).  In fact, the only court to consider a death-row inmate's request for funding for a videographer in connection with clemency proceedings denied the request.  *See Woods*, 2009 WL 3756847 at *7 (denying request for videographer to videotape expert testimony where expert testimony sought to relitigate claims during state clemency proceeding).  Hall's

14

implication that the president and his staff will not be able to evaluate his claims in a fair and impartial manner unless his petition is accompanied by a videotape is patently unconvincing.  This request clearly expresses a "want," not a "need."

## E. Airline Tickets at U.S. Government Rates (No Specific Amount Requested)

Hall finally asks that the Court authorize counsel, the investigator, and the requested experts to obtain airline tickets at United States government rates through Omega travel for work on his clemency application.  As discussed above, the services of the investigators and experts are not necessary to the preparation of Hall's clemency petition, and, even if the services were necessary, these individuals would not need to travel in order to render their services effectively.  To the extent counsel seeks funding for their own travel, that request would be more appropriately submitted via a request for attorney compensation.  Moreover, the motion submitted does not explain why counsel would have need to travel to visit with friends, family, and correctional officers, or with Hall, for that matter.  All of these people are likely available by telephone or mail.

## IV.  Conclusion

The Court is mindful of the unique nature of the interests at stake in death-penalty proceedings.  However, the Court must balance

these interests with its duty to spend taxpayer money responsibly. As the *Woods* court observed, "although [a prisoner subject to the death penalty] is entitled to all reasonably necessary means to defend himself, he is not entitled to a blank check signed by a willfully blind Court." *Woods*, 2009 WL 3756847, at *7. None of the additional services requested in the instant motion are "reasonably necessary" to Hall's clemency proceedings. Accordingly, the instant motion is DENIED.

SIGNED December 10, 2009.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/krr

16